Robert B. REICH, Secretary
of Labor, Petitioner,

v.

MASHANTUCKET SAND & GRAVEL,
and Occupational Safety and Health
Review Commission, Respondents.

No. 1722, Docket 95–4200.

United States Court of Appeals,
Second Circuit.

Argued June 17, 1996.

Decided Sept. 6, 1996.

Ellen L. Beard, Staff Attorney, Department of Labor (J. Davitt Mcateer, Acting Solicitor of Labor, Department of Labor, Allen H. Feldman, Associate Solicitor for Special Appellate and Supreme Court Litigation, Department of Labor, Washington, DC), for Petitioner.

Henry J. Sockbeson, Tribal Attorney, Mashantucket Pequot Tribe, Mashantucket, CT, for Respondents.

Before: KEARSE, MAHONEY, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

## BACKGROUND

Mashantucket Sand & Gravel ("MSG") is in the construction business. It is wholly owned and operated by the Mashantucket Pequot, a federally recognized Indian tribe. The Tribe has no treaty with the United States and maintains a reservation near Preston, Connecticut.

MSG employs approximately 100 people, both Indian and non-Indian. It works as an arm of the tribe, only on construction sites within the confines of its own reservation. The Tribal Council, the Tribe's governing body, decides the priority of MSG's construction jobs.

Among its various construction tasks, MSG workers excavate building sites, removing sand and gravel for processing. Its workers assist in the building of roads, tribal homes, and the continuing expansion of the Foxwoods High Stakes Bingo and Casino ("Foxwoods"). Foxwoods is located on the Reservation and is the principal source of income for the Tribe.

In the Spring of 1993, and with the Tribe's consent, federal inspectors entered the reservation to examine the Foxwoods site for compliance with the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. § 651 *et seq.* The inspectors found four violations of

OSHA: two "non-serious" and two "serious." The two non-serious violations were: (1) operation of a vehicle with a cracked windshield; and (2) allowing employees to work in a trench which had not been properly examined for cave-in risks. *See* 29 C.F.R. 1926.601(b)(5) (cracked windshield); 29 C.F.R. 1926.652(a)(1) (soil tests to determine maximum allowable slope to protect against cave-in).

The two serious violations were: (1) transporting employees on the tailgate of a pickup truck; and (2) failing to develop a written hazard communication program and to train employees regarding hazardous substances in their work environment. *See* 29 C.F.R. 1926.601(b)(8) (transporting employees); 29 C.F.R. 1926.59(e)(1) & (h) (hazardous substances communication program and training). Pursuant to § 9(a) of OSHA, the Secretary of Labor ("Secretary") issued citations for all four violations, and, pursuant to § 10(a) of OSHA, fined the Tribe two thousand dollars for the serious offenses.

The Tribe challenged the citations and fines, filing a notice of contest with the Occupational Safety and Health Review Commission ("OSHRC"). Subsequently, the Secretary filed a complaint with the OSHRC alleging the same violations set forth in the citations. *Secretary of Labor v. Mashantucket Sand & Gravel*, OSHRC Docket No. 93–1985 (May 4, 1994) (Yetman, *ALJ*.). The matter was heard before an Administrative Law Judge ("ALJ") of the OSHRC, and the parties stipulated that the only issue for resolution was whether OSHA applied to MSG's activities at the Foxwoods site.

The ALJ, following the Ninth Circuit's three-step analysis in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (9th Cir.1985), decided that OSHA did not apply to MSG's activities. First, the ALJ determined that OSHA was a law of general applicability, thus triggering a presumption that it "appl[ied] with equal force to Indians on reservations." *Coeur d'Alene*, 751 F.2d at 1115 (quoting *United States v. Farris*, 624 F.2d 890 (9th Cir.1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 919, 920, 66 L.Ed.2d 839 (1981)).

Second, the ALJ examined whether OSHA fell within an exception to the rule of general applicability. One of these exceptions is that a federal statute will not apply to an Indian tribe if it affects " 'exclusive rights of self-governance in purely intramural matters.' " *Id.* at 1116 (quoting *Farris*, 624 F.2d at 893). The ALJ described MSG as part of the "tribal government," the activities of which were "devoted to executing political decisions of the tribal council relating to 'projects within the tribe' that benefit the tribe." Finding that MSG was a creation of the Tribe, its workers were employed by the Tribe, and all work was performed on the reservation at the behest of the Tribal Council, the ALJ concluded that MSG was engaged in governmental activities of a purely intramural nature. Accordingly, even though OSHA was a law of general applicability, MSG's intramural activities fell within the *Coeur d'Alene* exception to the general application of a federal statute.

The Secretary appealed the decision within the OSHRC, which largely adopted the ALJ's decision and affirmed. The Commission rejected the Secretary's contention that MSG's construction of a casino that operated in interstate commerce took MSG beyond the pale of purely intramural activities. Similarly, the Commission was not persuaded that MSG's employment of non-Indians made their operation "extramural," reasoning that " 'Indian sovereignty is not conditioned on the assent of a non-member; to the contrary, the non-member's presence and conduct on Indian lands are conditioned by the limitations the tribe may choose to impose.' " *Secretary of Labor v. Mashantucket Sand & Gravel*, OSHRC Docket No. 93–1985, 1995 OSHRC No. 47, 1995 WL 561587 (Sept. 20, 1995)(Weisberg, Chairman; Montoya, Comm'r) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 147, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)).

The Secretary now appeals, urging us to follow the *Coeur d'Alene* framework, but to conclude that MSG's activities bring it under OSHA and *do not* fall within the intramural exception to statutory coverage. The Secretary contends that the Commission's root error lay in giving too much weight to MSG's status as an arm of the tribe; rather, he

argues, the proper focus should be on whether the employment relationship and construction activities were truly intramural. We agree with the Secretary, reverse the Commission's decision, and hold that OSHA applies to MSG's activities at the Foxwoods site.

## DISCUSSION

### I. Method of Analysis

The parties do not agree on how we should approach this case. The Secretary argues that, while the OSHRC properly followed the Ninth Circuit's test in *Coeur d'Alene*, it erred in its conclusion that OSHA would affect the Tribe's exclusive rights of self-governance in purely intramural matters. MSG argues that the OSHRC came to the right result, but should never have followed *Coeur d'Alene* in the first place. MSG argues that we should start with a presumption that, because it affects tribal sovereignty, OSHA does not apply unless Congress expressed its specific intent to abrogate tribal sovereignty. We reject MSG's approach as unworkable.

In *Coeur d'Alene*, the Ninth Circuit examined whether OSHA applied to a tribal farm. The court fashioned a three-part analysis. First, it borrowed a presumption, from a dictum in *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960), that "a general statute in terms applying to all persons includes Indians and their property interests." Second, it noted three exceptions to the rule of general applicability:

A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations...."

*Coeur d'Alene*, 751 F.2d at 1116 (quoting *Farris*, 624 F.2d at 893–94). Third, the court explained that even if a statute's application would interfere with tribal self-governance

over purely intramural matters, it would still apply to Indians if Congress expressly applied the statute to Indians. *See id.* The Mashantucket Pequot Tribe has no treaty with the federal government, thus eliminating the second exception. And OSHA is silent as to Indians, thereby eliminating the third. We concern ourselves only with the first exception.

The Secretary wants us to begin with the *Tuscarora* presumption that OSHA applies to MSG's activities, and determine, under *Coeur d'Alene*, that OSHA does not affect "exclusive rights of self-governance in purely intramural matters."

MSG dismisses the *Coeur d'Alene* methodology as no longer viable in light of the Supreme Court holdings in *United States v. Dion*, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), and *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). MSG would have us start with the presumption that federal statutes of general applicability touching upon sovereign rights of Indians do *not* apply to tribes, absent a clear indication of Congress's intent that the statute override tribal sovereignty. We conclude that *Dion* and *LaPlante* will not bear the load that MSG seeks to place on them.

In *Dion* the Court reviewed the Bald Eagle Protection Act, 16 U.S.C. § 668 *et seq.*, and the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, to determine whether either statute abrogated or modified a tribe's treaty-protected right to hunt bald eagles on its own reservation. The Court held that unless there "is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty," the statute would not apply. *Dion*, 476 U.S. at 740, 106 S.Ct. at 2220.

Likewise, in *LaPlante*, the Court, in examining whether the federal diversity statute, 28 U.S.C. § 1332, divested tribal courts of jurisdiction over civil causes of action arising out of events on an Indian reservation, concluded that:

178

[b]ecause the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal government, the proper inference from silence ... is that the sovereign power ... remains intact. In the absence of any indication that Congress intended the diversity statute to limit the jurisdiction of the tribal courts, we decline petitioner's invitation to hold that tribal sovereignty can be impaired in this fashion.

*LaPlante,* 480 U.S. at 18, 107 S.Ct. at 977–78 (citations and internal quotations omitted).

Braiding these two cases together, MSG crafts the following test:

a court faced with interpreting a federal statute that is silent as to applicability to an Indian Tribe must first inquire if that act would operate to infringe upon tribal internal rights of self-government. If an act would interfere with rights of tribal self-governance in internal matters then the court must conclude that the act does not apply. This conclusion can only be overcome if it is clear from the legislative history ... that Congress intended that the act apply in spite of this interference.

Appellee's Brief at 20. Applying this test, MSG maintains that OSHA: (1) would interfere with MSG's construction activities, which it characterizes as governmental in nature; and (2) would interfere with the Tribe's ability to adopt its own regulatory scheme, thereby trenching upon tribal sovereignty.

Upon first reading, MSG's test seems little different from the *Coeur d'Alene* approach. Both seem to state that a statute will not apply to a tribe if its application will affect tribal sovereignty. Closer scrutiny, however, reveals that MSG's proposed test would almost invariably compel the conclusion that every federal statute that failed expressly to mention Indians would not apply to them. We believe that so sweeping a conclusion is inconsistent with the limited sovereignty retained by Indian tribes.

## II. *Proper Mode of Analysis*

### A. *MSG's Proposed Test is Overbroad*

■ It cannot be gainsaid that Indian tribes are recognized as "distinct, independent political communities, retaining their original natural rights." *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832); *see Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831). Those rights are "retained" in the sense that they are not granted by the federal government, but are a function of the tribe's unique status as an aboriginal entity. *See* Felix S. Cohen, Handbook of Federal Indian Law 122 (1988 ed.).

■ Courts sometimes refer to this bundle of natural retained rights as the power of self-government or inherent sovereignty. But this is not to imply that Indian sovereignty is exclusive, any more than the sovereignty of a state is. The tribes' retained sovereignty reaches only that power "needed to control ... internal relations[,] ... preserve their own unique customs and social order[, and] .... prescribe and enforce rules of conduct for [their] own members." *Duro v. Reina,* 495 U.S. 676, 685–86, 110 S.Ct. 2053, 2060, 109 L.Ed.2d 693 (1990); *see also LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). Toward this end, the Supreme Court has recognized that a tribe may regulate any internal conduct which threatens the "political integrity, the economic security, or the health or welfare of the tribe." *Montana v. United States,* 450 U.S. 544, 566, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981); *See Coeur d'Alene,* 751 F.2d at 1115.

Recognizing that Indian tribes have sovereign power to regulate conduct affecting tribal political integrity, economic stability, and general health and welfare, it is not difficult to see how MSG's approach goes a step too far. MSG contends that no federal statute affecting sovereignty applies to Indians, unless it expressly so provides or the legislative intent is clear. Almost every federal statute, however, no matter how innocuous on its face, affects tribal sovereignty as broadly interpreted by MSG.

■ This is too grandiose a concept of tribal sovereignty. Tribal sovereignty is "dependent on, and subordinate to," the federal government. *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65

L.Ed.2d 10 (1980). It is of such a "unique and limited" character that it exists only "at the sufferance of Congress." *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). Hence, tribal power, even regarding exclusively internal conflicts, may be limited by treaty or federal statute, *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 880 n.6 (2d Cir. 1996), including statutes that are silent as to Indians. *See, e.g., Smart v. State Farm Ins. Co.*, 868 F.2d 929, 935 (7th Cir.1989) (citing F. Cohen, Handbook on Federal Indian Law 399 (1982 ed.) ("[T]here can be little doubt that tribes are subject to [federal employment withholding taxes].... Tribes and Indians have in fact complied with this law, and there seems no controversy over it.")); *Navajo Tribe v. Nat'l Labor Relations Bd.*, 288 F.2d 162 (D.C.Cir.), *cert. denied*, 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 387 (1961). Nobody questions that an Indian tribe may, in the absence of a federal statute, act on its inherent sovereign power to adopt regulations for its tribe. It is quite different to hold, however, that this broad sovereign power essentially preempts the application of a federal regulatory scheme which is silent on its application to Indians.

### B. *Coeur d'Alene*

The *Coeur d'Alene* test does not raise the spectre of overbreadth to the degree that MSG's proposed test does. The *Coeur d'Alene* court recognized that a statute of general application presumably applies to Indian tribes unless it affects exclusive rights of governance over "purely intramural matters." This test is more accommodating to notions of federal and tribal sovereignty. "Purely intramural matters" generally involve matters such as tribal membership, inheritance rules, and domestic relations. *Coeur d'Alene*, 751 F.2d at 1116. Unlike MSG's test, the *Coeur d'Alene* intramural exception does not include *all* aspects of sovereignty. *See Smart*, 868 F.2d at 935 n.5; *see also Farris*, 624 F.2d at 893.

The Seventh Circuit has come to a similar conclusion. In *Smart v. State Farm Ins. Co.*, a tribe argued that ERISA did not apply to Indians because it affected tribal sovereign-

ty. The Seventh Circuit, following *Coeur d'Alene*, reasoned that ERISA applied to tribes despite its effect on sovereignty in general:

> Any federal statute applied to an Indian on a reservation or to a Tribe has the arguable effect of eviscerating self-governance since it amounts to a subordination of the Indian government. But Indian Tribes are not possessed of absolute sovereignty.... Statutes of general application are already applied to Indian Tribes which have the same arguable effect of interfering with the Tribe's ability of self-governance ... for example federal employment withholding taxes....

868 F.2d at 935 (citations omitted). The court concluded that "[a] statute of general application will not be applied to an Indian Tribe when the statute threatens the Tribe's ability to govern its intramural affairs, but not simply whenever it merely affects self-governance as broadly conceived." *Id.*

We therefore reject MSG's proposed test as casting too wide a net. When taken to its logical limits, it would preclude the application of any federal legislation, silent as to Indians, that in some way affects the political integrity, economic security, or health and welfare of a tribe. Such a test greatly expands the niche the federal government has carved out for Indian tribes: that of a sovereign with limited powers, "dependent on, and subordinate to" the federal government. *See Colville*, 447 U.S. at 154, 100 S.Ct. at 2081.

### III. *MSG's Activities*

MSG advances two arguments against the application of OSHA. First, it likens itself to a department of public works, and OSHA's application to it would therefore interfere with an exercise of tribal sovereignty. Second, MSG contends that OSHA's application would interfere with the Tribe's ability to self-govern by precluding the Mashantucket Pequot from adopting their own safety regulations. We reject both arguments.

### A. *MSG's Construction Activities*

MSG contends that OSHA's application will interfere with its governmental function in intramural matters. MSG describes

its construction operation as governmental because it works on projects selected and prioritized by the Tribal Council. MSG considers its endeavors intramural because it works exclusively on its own reservation. MSG does not deny, however, that it hires non-Indians and continues to work on the construction of Foxwoods, a casino clearly operating in interstate commerce. The nature of MSG's work, the employment of non-Indians, and the continuing work at Foxwoods, taken together, doom MSG's claim that its work implicates exclusive rights of self-governance in purely intramural matters.

### 1. *The Nature of MSG's Work*

MSG takes its orders from the Tribal Council, which selects projects with the greatest benefit for the Tribe. How and from whom MSG receives its jobs, however, does not magisterially transform its operation into an exercise of sovereign power. When all is said and done, MSG is in the construction business; and its activities are of a commercial and service character, not a governmental character. *See Reich v. Great Lakes Indian Fish and Wildlife Comm'n*, 4 F.3d 490, 495 (7th Cir.1993).

In *Reich v. Great Lakes Indian Fish and Wildlife Commission*, the Seventh Circuit drew a similar distinction. The court was asked to consider whether wildlife officers employed by a tribe were exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA"). The court concluded that the wildlife officers were similar to police officers, and thus were exercising governmental power. Accordingly, the court held that the application of the FLSA would interfere with tribal self-governance. In so holding, however, the court was careful to distinguish the activities of the wildlife officers from workers on a tribal farm (*Coeur d'Alene*, 751 F.2d at 1113), lumber mill (*United States Dep't of Labor v. Occupational Safety & Health Review Comm'n*, 935 F.2d 182 (9th Cir.1991) ("*OSHRC*")), or health care facility (*Smart*, 868 F.2d 929). *Great Lakes*, 4 F.3d at 495.

So too in *OSHRC*, the Ninth Circuit concluded that the activities of a tribal lumber mill, which took direction from a tribal coun-

cil, did not touch exclusive rights of self-governance in purely intramural matters. *OSHRC*, 935 F.2d at 184. And in *Smart*, the Seventh Circuit determined that ERISA applied to a tribal health care facility despite the fact that the operation was owned and operated by the tribe. *Smart*, 868 F.2d at 935–36.

MSG excavates construction sites at the Tribe's behest for the benefit of tribal members. We think that such an operation is akin to the tribal mill in *OSHRC*, and has characteristics of a service-oriented endeavor like the tribal health care facility in *Smart*. That an entity is owned by a tribe, operates as an arm of a tribe, or takes direction from a tribal council, does not ipso facto elevate it to the status of a tribal government.

### 2. *The Employment of Non–Indians*

■ Unlike other sovereignties, Indian tribes have limited power over external affairs. "Upon coming under the authority of the United States[,] ... certain limitations upon the external powers of tribal self-government necessarily followed." Felix S. Cohen, Handbook of Federal Indian Law 231–32 (1982 ed.) (quoted in *Wheeler v. U.S. Dep't of Interior*, 811 F.2d 549, 551 (10th Cir. 1987)). Tribes were divested of their powers over external affairs because their dependent status "within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations." *United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 1088, 55 L.Ed.2d 303 (1978).

■ Limitations on tribal authority are particularly acute where non-Indians are concerned. *See id.* The Supreme Court has recognized that tribal "inherent sovereign powers ... do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258; *see also A–1 Contractors v. Strate*, 76 F.3d 930, 939 (8th Cir.1996). This is so because the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes...." *Montana*, 450 U.S. at 564, 101 S.Ct. at 1258.

MSG's employment of non-Indians weighs heavily against its claim that its activities affect rights of self-governance in purely intramural matters. In general, tribal relations with non-Indians fall outside the normal ambit of tribal self-government. Furthermore, intramural matters generally consist of conduct the immediate ramifications of which are felt primarily within the reservation by members of the tribe. *Cf. Farris*, 624 F.2d at 893 (intramural activities in the nature of conditions of tribal membership, domestic relations, and inheritance rules). Thus, the employment of non-Indians is another factor that tips the balance toward application of OSHA.

### 3. *Construction Work on Foxwoods*

MSG continues to build expansions on the Foxwoods Hotel and Casino. MSG does not contest that the casino operates in and affects interstate commerce. Indeed, "a bingo hall and casino [even one on tribal grounds] designed to attract tourists from surrounding states undeniably affects interstate commerce...." *United States v. Funmaker*, 10 F.3d 1327, 1331 (7th Cir.1993) (citing *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964)). MSG's construction efforts, even though they occur solely on the reservation, have a direct effect on interstate commerce. *Cf. Donovan v. S & L Dev. Co.*, 647 F.2d 14, 18 (9th Cir.1981) ("any construction work, regardless of the size or duration of the project, is likely to have an effect on interstate commerce"). When a tribal operation affects open markets, it is unlikely that the operation is purely intramural. *See Coeur d'Alene*, 751 F.2d at 1116 (operation of a farm which employs non-Indians and sells produce in open market does not touch tribal self-governance).

These separate tiles—the nature of MSG's work, its employment of non-Indians, and the construction work on a hotel and casino that operates in interstate commerce—when viewed as a whole, result in a mosaic that is distinctly inconsistent with the portrait of an Indian tribe exercising exclusive rights of self-governance in purely intramural matters. *See United States Dep't of Labor v. Occupational Safety & Health Comm'n*, 935 F.2d at 184 (mill which employs non-Indians and sells wares in channels of interstate commerce not related to "exclusive rights of self-governance in purely intramural matters.").

### B. *Ability to Advance its Own Regulations*

MSG's final argument is that OSHA will affect tribal self-governance by precluding the promulgation of its own safety regulations. We are not persuaded.

First, protesting the application of a federal statute because it affects the tribe's sovereign power to adopt a different regulatory scheme proves too much. Indeed, "[a]ny federal statute applied to an Indian on a reservation or to a Tribe has the arguable effect of eviscerating self-governance since it amounts to a subordination of the Indian government." *Smart*, 868 F.2d at 935. The question is not whether the statute affects tribal self-governance *in general*, but rather whether it affects tribal self-governance *in purely intramural matters*. As already discussed in Section III. A., the nature of MSG's activities, its employment of non-Indians, and its construction at Foxwoods renders its conduct *extramural*.

Second, there is nothing to prevent the Mashantucket Pequot Tribe from adopting its own safety regulations, as long as those regulations do not conflict with the application of OSHA. The government concedes that tribes are not states under OSHA, *see* 29 U.S.C. § 652(7), and thus, OSHA does not preempt tribal safety regulations in the same manner in which it preempts state laws. *See Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96–104, 112 S.Ct. 2374, 2381–86, 120 L.Ed.2d 73 (1992) (describing OSHA's preemption of state laws). Thus, the Tribe is free to adopt any additional regulations, consistent with OSHA, which it deems necessary.

We conclude, therefore, that application of OSHA will not affect exclusive rights of self-governance in purely intramural matters. MSG's activities do not fall within the *Coeur d'Alene* exception to the application of federal statutes.

182

## CONCLUSION

We adopt the Ninth Circuit's method of analysis in *Coeur d'Alene* as the appropriate test to determine whether a statute, silent as to Indians, applies to tribes.

We disagree with the OSHRC that OSHA's application will interfere with tribal self-governance over purely intramural matters.

■ Given our holding that OSHA does not fall within one of the *Coeur d'Alene* exceptions to the application of federal statutes, it is unnecessary to address the Secretary's additional argument that the Indian Self–Determination and Education Act, 25 U.S.C. § 450 *et seq.*, provides clear Congressional intent of OSHA's applicability to tribes. We also reject amicus's argument that the Secretary's enforcement action is barred unless there is a clear and unequivocal waiver of tribal sovereign immunity. Tribal sovereign immunity does not bar suits by the United States. *See Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1459–60 (9th Cir.1994).

Accordingly, we reverse the decision of the OSHRC.