**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HILDA L. SOLIS, Secretary of
Labor, United States Department
of Labor,
            *Plaintiff-Appellee,*

                v.

PAUL MATHESON, an individual
doing business as Baby Zack's
Smoke Shop; NICK MATHESON, an
individual,
            *Defendants-Appellants.*

No. 07-35633

D.C. No.
3:06-cv-05361

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
November 21, 2008—Seattle, Washington

Filed April 20, 2009

Before: Betty B. Fletcher and Johnnie B. Rawlinson,
Circuit Judges, and David Alan Ezra,* District Judge.

Opinion by Judge Ezra

*The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation.

## COUNSEL

Robert E. Kovacevich, Spokane, Washington, for the appellants.

Jonathan L. Snare, Acting Solicitor of Labor, Steven J. Mandel, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, Mary J. Rieser, Attorney, Gregory F. Jacob, Attorney (argued), Washington, D.C., for the appellee.

## OPINION

EZRA, District Judge:

In this opinion we resolve whether the overtime provisions of the Fair Labor Standards Act ("FLSA") apply to a retail

business located on an Indian reservation and owned by Indian tribal members. We also resolve whether Appellee the Secretary of Labor for the United States Department of Labor (the "Secretary") has the authority to enter the Indian reservation to inspect the books of that business. Finally, we resolve whether it was an abuse of discretion for the district court to appoint a receiver for the retail business in the event the overtime payments were not made.

We conclude that the overtime requirements of the FLSA apply to the retail business at issue in this case. Because the FLSA applies to the retail business, we conclude that the Secretary had the authority to enter the Indian reservation to audit the books of the business, as she would regularly do with respect to any private business. We therefore affirm the decision of the district court on these two issues.

We conclude that the district court's decision with respect to the automatic appointment of a receiver over the retail business in the event the overtime payments were not made was premature. We therefore vacate that portion of the judgment.

I.

BACKGROUND

The parties stipulated to the underlying facts of this case.

A. Baby Zack's Smoke Shop

Appellant Paul Matheson is a member of the Puyallup Tribe. The Puyallup Tribe is a Pacific Northwest Indian tribe that has a reservation in the State of Washington. Paul Matheson owns and operates a retail store known as Baby Zack's Smoke Shop ("Baby Zack's")[1], located on trust land within

_____

[1]Paul Matheson, Nick Matheson and Baby Zack's are referred to herein collectively as "the Mathesons."

the Puyallup Indian Reservation. Appellant Baby Zack's sells tobacco products and sundries to Indians and non-Indians. Some of the goods sold by Baby Zack's have been shipped in from locations outside the State of Washington. Baby Zack's accepts credit card and debit card payments and uses electronic or telephonic means of communication to banks and credit card companies located outside of the State of Washington. Baby Zack's regularly employs both Indian and non-Indian workers.

In 2004 and 2005, Baby Zack's had an annual gross volume of sales of not less than $500,000. Paul and Nick Matheson are employers within the meaning of the FLSA. If the FLSA applies, the amount of wages due to employees and former employees is $31,354.87.

B.   The Medicine Creek Treaty

The Puyallup Tribe entered into a treaty in the 1850s known as the Treaty of Medicine Creek. The Treaty of Medicine Creek provides that the "tribes and bands agree to free all slaves now held by them, and not to purchase or acquire others hereafter." The Treaty of Medicine Creek also provides that certain lands are for "exclusive use" of the Indians, "nor shall any white man be permitted to reside upon the same without permission of the tribe and the superintendent or agent."

C. Procedural History

The Secretary subpoenaed the books of Baby Zack's and determined that the Mathesons had failed to pay overtime wages to its employees, as required by the FLSA. The Secretary filed suit and a motion for summary judgment. The district court granted the Secretary's motion for summary judgment, finding that the FLSA applied to the Mathesons.

The district court later entered judgment (the "Judgment") concluding that the FLSA applied to the Mathesons, and their failure to pay overtime wages violated the FLSA. The Judgment provided that the Mathesons were enjoined from violating the FLSA, they must pay $31,339.27[2] in overtime wages, and if they failed to do so, the court would appoint a receiver from a list of potential receivers provided by the Secretary or one of its own choosing, and the Mathesons would be required to pay the costs of the receiver. In addition, the Judgment stated that the receiver would have full authority to collect assets and report findings, redeem or liquidate assets, turn over proceeds, and prevent waste or fraud.

The Mathesons appealed both the decision regarding the applicability of the FLSA and the automatic appointment of a receiver upon the failure to pay, which was set forth for the first time in the Secretary's proposed judgment.

## II.

## STANDARDS OF REVIEW

We review a district court's grant of summary judgment de novo. *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (citing *Aguilera v. Baca*, 510 F.3d 1161, 1165-67 (9th Cir. 2007)).

We review the district court's appointment of a receiver upon failure to pay for abuse of discretion. *See View Crest Garden Apartments, Inc. v. United States*, 281 F.2d 844, 849 (9th Cir. 1960) (holding that "the [district] Court acted well within the discretionary powers a court of equity exercises in appointing a receiver"); *see also SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) (reviewing for abuse of discretion

---

[2]There is no explanation for the discrepancy between this amount and the stipulated amount of $31,354.87 owed.

the district court's decision involving supervision of receiver-ship).

## III.

## DISCUSSION

### A.   The Application of the FLSA to the Mathesons

[1] The Mathesons argue that the FLSA does not apply in this instance because they qualify for either or both the intra-mural affairs exception set forth in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1115-16 (9th Cir. 1985), or the treaty rights exception. We disagree.

The central aim of the FLSA is to achieve certain minimum labor standards, such as overtime requirements, with respect to industries engaged in commerce. 29 U.S.C. § 202. "The FLSA is a statute of general applicability," *Snyder v. Navajo Nation*, 382 F.3d 892, 894 (9th Cir. 2004) (citation omitted), that is to be construed liberally. *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000). Congress did not expressly make the FLSA applicable to Indian tribes. *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 493 (7th Cir. 1993). The issue in this case is whether, as a statute of general applicability, the FLSA applies to the Mathesons' business, which is owned and run by tribal members and located on the tribe's reservation.

Indian tribes have a special status as sovereigns with lim-ited powers. Indian tribes are dependent on, and subordinate to the federal government, yet retain powers of self-government. *See Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 154 (1980); *Mac-Arthur v. San Juan County*, 497 F.3d 1057, 1067 (10th Cir. 2007), *cert. denied,* 128 S.Ct. 1229 (2008). However, those powers may be limited, modified, or eliminated by Congress. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978).

> The tribes' retained sovereignty reaches only that power needed to control internal relations, preserve their own unique customs and social order, and prescribe and enforce rules of conduct for their own members. Toward this end, the Supreme Court has recognized that a tribe may regulate any internal conduct which threatens the political integrity, the economic security, or the health or welfare of the tribe.

*Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 178-79 (2nd Cir. 1996) (citations, quotation marks, brackets, and ellipses omitted).

[2] Indians and their tribes are equally subject to statutes of general applicability, just as any other United States citizen. *Coeur d'Alene*, 751 F.2d at 1115; *Fed. Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 116 (1960). However, a statute of general applicability that is silent on the issue of applicability to Indian tribes, like the FLSA, does not apply to Indian tribes if:

> (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended the law not to apply to Indians on their reservations. In any of these three situations, Congress must expressly apply a statute to Indians before we will hold that it reaches them.

*Coeur d'Alene*, 751 F.2d at 1116 (citations, quotation marks, brackets, and ellipses omitted). The Mathesons assert that the first exception known as the intramural affairs exception, or the second exception known as the treaty rights exception, applies in this case.

### 1. Self-Government and Intramural Affairs Exception

"[T]he tribal self-government exception is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes." *Coeur d'Alene*, 751 F.2d at 1116 (citation omitted). Although these are not the only matters which could be covered by this exception, exemptions have been allowed "only in those rare circumstances where the immediate ramifications of the conduct are felt primarily within the reservation by members of the tribe and where self-government is clearly implicated." *Snyder*, 382 F.3d at 895.

**[3]** The only case in this Circuit regarding the applicability of the FLSA to Indian tribes is the *Snyder* case. In *Snyder,* this court addressed whether tribal law enforcement officers who enforced the law on an Indian reservation were entitled to overtime payments pursuant to the FLSA. *Id.* at 894. This court held that law enforcement was "an appropriate activity to exempt as intramural" because it was "a traditional governmental function", and the FLSA contained an express exemption for state and local law-enforcement officers in 29 U.S.C. §§ 207(k), 207(o). *Id.* at 895. This court also found that although the officers traveled outside of the reservation to provide information or to testify in a court, they did

> so because of a crime that occurred on the reservation or directly affected the interests of the tribal community. Thus, such services performed off-reservation nevertheless relate primarily to tribal self-government and remain part of exempt intramural activities. Such travel does not relate to any non-government purpose. Nor does it provide primary benefits to persons with no interest or stake in tribal government. Indeed, none of the officers' official travel is aimed at benefiting any private organization or nonmember. Employed by an arm of the tribal

> government, officers serve the tribe's governmental need for law enforcement to promote the welfare of the tribe and its members.

*Id.* at 896 (citation omitted); *see also Great Lakes*, 4 F.3d at 495 (holding that law enforcement officers were exempt from overtime requirements of FLSA because they performed governmental functions).

While there is no case directly on point in this Circuit, there are cases both from this Circuit and others deciding the applicability of other federal employment statutes to Indian tribes. In *Coeur d'Alene*, this court recognized that the Occupational Safety and Health Act ("OSHA") is a statute of general applicability, and that it applied to a farm wholly owned and operated by the Coeur d'Alene Indian Tribe, located entirely within the Indian reservation. *Coeur d'Alene*, 751 F.2d at 1114. This court recognized that the Tribe had "the inherent sovereign right to regulate the health and safety of workers in tribal enterprises. But neither [wa]s there any doubt that Congress has the power to modify or extinguish that right. Unlike the states, Indian tribes possess only a limited sovereignty that is subject to complete defeasance." *Id.* at 1115 (citations omitted). This court, therefore, found that none of the exceptions applied because the farm was a commercial enterprise that produced grain and lentils exclusively for sale on the open market in interstate commerce, and because the farm employed non-Indian workers. *Id.* at 1114, 1116. Thus, the farm's activities were neither profoundly intramural, nor essential to self-government. *Id.*

The tribe in *Coeur d'Alene* had argued that under their rights to self-government and to exclude non-Indians, they could exclude OSHA inspectors as part of their " 'fundamental aspect' of tribal sovereignty that cannot be infringed without a clear expression of congressional intent." *Id.* at 1116-17. This court stated that it had "never employed this fundamental aspect of sovereignty formulation of the tribal self-

government exception to the general rule that federal statutes ordinarily apply to Indians," and declined to do so for the Coeur d'Alene tribe. *Id.* (internal quotation omitted).

In *EEOC v. Karuk Tribe Housing Authority*, 260 F.3d 1071, 1079-80 (9th Cir. 2001), this court found that the Age Discrimination in Employment Act ("ADEA") did not apply to an employment relationship between the Karuk Tribe Housing Authority, a tribal governmental employer, and a tribe member, because it touched "on 'purely internal matters' related to the tribe's self-governance."[3] The dispute did "not concern non-Karuks or non-Indians as employers, employees, customers, or anything else." *Id.* at 1081. This court noted that "[t]he Housing Authority . . . functions as an arm of the tribal government and in a governmental role. It is not simply a business entity that happens to be run by a tribe or its mem-

---

[3]In *EEOC v. Fond du Lac Heavy Equipment and Construction Co., Inc.*, 986 F.2d 246 (8th Cir. 1993), the Eighth Circuit took a different approach to find that the ADEA did not apply to the narrow facts of the case. First, the Eighth Circuit found that the dispute regarding whether an employer could consider an applicant's age was between an Indian applicant and an Indian tribal employer which was located on the reservation. The Eighth Circuit held that

> [s]ubjecting such an employment relationship between the tribal member and his tribe to federal control and supervision dilutes the sovereignty of the tribe. The consideration of a tribe member's age by a tribal employer should be allowed to be restricted (or not restricted) by the tribe in accordance with its culture and traditions. Likewise, disputes regarding this issue should be allowed to be resolved internally within the tribe. Federal regulation of the tribal employer's consideration of age in determining whether to hire the member of the tribe to work at the business located on the reservation interferes with an intramural matter that has traditionally been left to the tribe's self-government.

*Id.* at 249. Due to the intramural nature of the matter, the Eighth Circuit held that as a statute of general applicability, the ADEA did not apply "absent a clear and plain congressional intent." *Id.* The Eighth Circuit found that there was no clear and plain intention of Congress to apply the ADEA to Indian tribes. *Id.* at 250.

bers, but, rather, occupies a role quintessentially related to self-governance." *Id.* at 1080.

Unlike the housing authority in the *Karuk Tribe* case, *NLRB v. Chapa De Indian Health Program, Inc.*, 316 F.3d 995, 1000 (9th Cir. 2003), involved a financially independent, nonprofit organization of the Rumsey Tribe that contracted to provide health services to members of the tribe as well as others, and operated outside of the reservation. The organization argued that the National Labor Relations Act ("NLRA") did not apply to its activities because providing health care services to tribal members was purely intramural. *Id.* at 998-99. This court found that the activities were not exempt from provisions of the NLRA because the organization itself was not a tribe and even if the Rumsey Tribe terminated its funding of the organization, the organization would have other resources available to operate. *Id.* at 1000. In addition, the health care facilities were not located on Indian land, and nearly half of the patients and the nonprofessional employees involved in the controversy were non-Indian. *Id.* This court stated that the non-Indian patients and non-Indian employees cut against the organization's "claim that its activities touch rights of self-governance on a purely intramural matter." *Id.* Finally, none of the organization's board members were members of the tribe and the organization did not argue that its labor relations were intramural activities related to self-governance. In light of these circumstances, this court held that "applying the NLRA does not clearly appear to touch on purely intramural matters that affect the right to self-governance." *Id.*

Other cases have similarly affirmed the application of OSHA, the Employee Retirement Income Security Act ("ERISA"), and the Americans with Disabilities Act ("ADA") to tribal businesses. *See U.S. Dep't of Labor v. Occupational Safety & Health Review Comm'n*, 935 F.2d 182, 183-84 (9th Cir. 1981) (finding tribal lumber mill employer subject to OSHA because it "employ[ed] a significant number of non-

Native Americans and [sold] virtually all of its finished product to non-Native Americans through channels of interstate commerce"); *Mashantucket Sand & Gravel*, 95 F.3d at 181 (finding that OSHA applied to tribe-owned construction business); *Lumber Indus. Pension Fund v. Warm Springs Forest Prods. Indus.*, 939 F.2d 683, 684-85 (9th Cir. 1991) (holding that ERISA, as a statute of general applicability, applied to a tribally owned and operated sawmill because "[t]he self-government exception applies only where the tribe's decision-making power is usurped[, and] [p]ermitting the Fund to sue the mill under ERISA . . . will not usurp the tribe's decision-making power"); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 935-36 (7th Cir. 1989) (applying ERISA to health care facility owned and operated by tribe and located on tribal land); *Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1129 (11th Cir. 1999) (holding that ADA's public accommodation requirements could apply to restaurant and gaming business run by an Indian tribe because the business did "not relate to the governmental functions of the Tribe, nor d[id] it operate exclusively within the domain of the Tribe and its members").

The Mathesons rely on *United States v. Lara*, 541 U.S. 193 (2004), asserting that it stands for the proposition that as sovereign entities with power over their members, tribes possess inherent power to control events that occur on their land. The Mathesons also assert that *Lara* stands for the proposition that Congress could not enact laws modifying tribal inherent power.

The Mathesons' reliance is misplaced. The *Lara* case dealt with the inherent tribal authority to prosecute tribe members. *See id.* at 204-05. The Supreme Court in *Lara* held that Congress possessed the power to lift restrictions on tribes' criminal jurisdiction over nonmember Indians. *Id.* at 200. The *Lara* case did not hold that tribes possess inherent power to control events that occur on their land or that Congress could not enact laws modifying that power. Indeed, as noted above, the

Supreme Court has held that "Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *Santa Clara Pueblo*, 436 U.S. at 56 (citation omitted). The Mathesons fail to provide an appropriate analogy between the *Lara* case and the instant case, and we find none.

The Mathesons also assert that the *Lara* case aligns with the earlier case from the Tenth Circuit, *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002). The Tenth Circuit in *Pueblo of San Juan* determined whether "in light of the Constitution's Supremacy Clause and Congress's plenary power over Indian affairs, the NLRA prevents [through preemption] the Pueblo from enacting a 'right-to-work' law or entering into a lease with provisions making prohibitions similar to those in right-to-work laws." *Id.* at 1190.

The Mathesons' reliance on this case is also misplaced because the general applicability of the NLRA was not at issue. *Id.* at 1191. Additionally, the Pueblo had exercised its sovereign authority by enacting a labor regulation. *Id.* at 1199. The Pueblo was not acting in a proprietary capacity, such as an employer or landlord. *Id.* at 1191. The Tenth Circuit found that "as an Indian tribe, [the Pueblo] retain[ed] the sovereign power to enact its right-to-work ordinance, and to enter into the lease agreement with right-to-work provisions, because Congress has not made a clear retrenchment of such tribal power as is required to do so validly." *Id.*

**[4]** Here, although the Supreme Court has found that Indian tribes have "a strong interest as a sovereign in regulating economic activity involving its own members within its own territory and . . . may enact laws governing such activity[,]" *see Pueblo of San Juan*, 276 F.3d at 1200 (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982)), the Mathesons do not argue that the Puyallup Tribe enacted a different wage and hour law that applied in place of the FLSA, nor do they assert that the FLSA does not preempt any such law. *See*

*Great Lakes*, 4 F.3d at 493 (stating that if "the Chippewa had a treaty right to employ law enforcement officers on any terms, the Fair Labor Standards Act would be presumed not to abrogate the right by forcing the Great Lakes Indian Fish and Wildlife Commission to pay time and a half for overtime"). Thus, there is no evidence in the record that the Puyallup Tribe has acted on its right of self-governance in the field of wage and hours laws and specifically with respect to overtime.

**[5]** Because the Puyallup Tribe has not enacted wage and hour laws, the holdings of the cases discussed above lead this court to conclude that the overtime provisions of the FLSA apply to the Mathesons and the intramural affairs exception does not. Baby Zack's is a purely commercial enterprise engaged in interstate commerce selling out-of-state goods to non-Indians and employing non-Indians. *See Mashantucket Sand & Gravel*, 95 F.3d at 181 ("[E]mployment of non-Indians weighs heavily against its claim that its activities affect rights of self-governance in purely intramural matters. In general, tribal relations with non-Indians fall outside the normal ambit of tribal self-government. . . . When a tribal operation affects open markets, it is unlikely that the operation is purely intramural."). Unlike many of the businesses in the cases discussed above, Baby Zack's is not a tribal business, although it is owned by tribe members. Therefore, the district court's finding that the intramural exception does not apply because there is nothing profoundly intramural or involving self-governance about the employment of Indians and non-Indians by a retail business engaged in interstate commerce is affirmed.

2.   Treaty Rights Exception

**[6]** The Mathesons next argue that the Treaty of Medicine Creek addresses employment rights and payment of overtime, although crudely, because the Treaty states that "[t]he said

tribes and bands agree to free all slaves now held by them, and not to purchase or acquire others hereafter."

"Indian treaties are deemed the legal equivalent of federal statutes and they can therefore be modified or even abrogated by Congress. . . . Nevertheless, the presumption is that a statute does not modify or abrogate Indian treaty rights." *Great Lakes*, 4 F.3d at 493 (citing *United States v. Dion*, 476 U.S. 734, 738-40 (1986), and *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979)).

**[7]** "The text of a treaty must be construed as the Indians would naturally have understood it at the time of the treaty, with doubtful or ambiguous expressions resolved in the Indians' favor." *United States v. Smiskin*, 487 F.3d 1260, 1264 (9th Cir. 2007). "Ambiguities in tribal treaties are construed liberally to favor Native Americans and to respect traditional notions of Native American sovereignty." *Occupational Safety & Health Review Comm'n*, 935 F.2d at 185.

In *Smiskin*, this court distinguished its findings in a previous case, *United States v. Baker*, 63 F.3d 1478 (9th Cir. 1995), which analyzed a different section of the Medicine Creek Treaty than is at issue in the present case. *Baker* involved members of the Puyallup Tribe who "trafficked in unstamped cigarettes without obtaining prior approval from the State of Washington, in violation of Washington Administrative Code section 458-20-192. The cigarettes were therefore unauthorized under state law and contraband under the CCTA [Contraband Cigarette Trafficking Act]." *Smiskin*, 487 F.3d at 1267.

The *Smiskin* opinion noted that the Medicine Creek Treaty provided only that "[t]he said tribes and bands finally agree not to trade at Vanzcouver's Island, or elsewhere out of the dominions of the United States." 487 F.3d at 1267 (citation omitted). The relevant part of the Treaty did not expressly

grant any right to the Puyallup Tribe and was ambiguous regarding any "trading right." *Id.* In stark contrast, the Yakama Treaty, which is a different treaty with a different tribe, expressly granted the "right to travel." *Id.* Therefore, this court found that the "CCTA would certainly be an impermissible restriction on the Yakamas' right to travel if the Government could rely on it to enforce against tribal members a state *fee* on the transport of unstamped cigarettes." *Id.* (emphasis in original).

*Great Lakes* involved treaties that covered "thirteen Chippewa Indian tribes that inhabit the Great Lakes region." *Great Lakes*, 4 F.3d at 492. The Great Lakes Indian Fish and Wildlife Commission (the "Commission") supervised the activities and enforced the rights retained by the treaties, including hunting and fishing. *Id.* The Commission did not pay time and half for overtime to its officers. *Id.* at 491. The Department of Labor sought enforcement of a subpoena seeking evidence that the Commission was in violation of the FLSA. *Id.* In order to determine whether the subpoena could be enforced, and whether the Department had jurisdiction to regulate wages of the Commission, the Seventh Circuit reviewed the treaties at issue. The Seventh Circuit determined that the treaties contained only "rights to hunt, fish and gather." *Id.* at 493. The treaties did not mention a system for enforcing those rights, or contain any reference to "terms of employment of those hired to enforce it." *Id.* Therefore, the court focused on the FLSA itself and its exemption for state and local law enforcement officers. *Id.*

**[8]** Here, there is nothing in the Medicine Creek Treaty directly on point discussing employment or wages and hours. Moreover, the language regarding freeing all slaves is not so ambiguous that it could be construed to cover the payment of required wages. Therefore, the application of the overtime provisions of the FLSA to a retail business such as Baby Zack's does not impact the tribe's agreement that it would free all slaves.

Relying on *Montana v. United States*, 450 U.S. 544 (1981), the Mathesons additionally argue that their Treaty right to occupy and exclude gives them a right to regulate employment relationships with those non-tribal members who consent to employment by tribal members.

"[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands . . . ." *Merrion*, 455 U.S. at 141. In *Montana*, the Supreme Court stated that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U.S. at 565. This is because the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes." *Id.* at 564.

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Id.* at 565-66 (citations omitted).

As was the case in *Montana*, here also, "[n]o such circumstances . . . are involved in this case." *Id.* at 566. First, there is no evidence that the Puyallup Tribe asserted regulatory authority over employment and wages for non-Indians. *See MacArthur*, 497 F.3d at 1069 ("*Montana* only applies insofar

as the tribe in question is seeking to assert regulatory author-
ity over the activities of a nonmember."). The Mathesons'
only argument in this regard is that they were issued a busi-
ness license by the Tribe. Such information, however, is not
in the record. Even if it were, the issuance of a license to do
business does not mean that the Puyallup Tribe has sought to
regulate wages and hours of employees.

Second, there is no evidence that the non-Indians employed
at Baby Zack's entered into any agreements or dealings with
the Puyallup Tribe that would subject the non-Indians to tribal
civil jurisdiction. Finally, the Mathesons have not alleged that
requiring payment of time and a half for overtime imperils the
welfare of the Tribe. We, therefore, conclude that the *Mon-
tana* holding is inapplicable to the instant case.

The Mathesons also contend that the right to exclude and
the language preventing non-Indians from residing on their
land prevents the Department of Labor from entering the res-
ervation to investigate FLSA violations.

In *Occupational Safety & Health Review Commission*, the
treaty described the boundaries for the reservation and stated
that "[a]ll of which tract shall be set apart, and, so far as nec-
essary, surveyed and marked out for [the tribe's] exclusive
use; nor shall any white person be permitted to reside upon
the same without the concurrent permission of the agent and
superintendent." 935 F.2d at 184 (citation omitted). Constru-
ing the treaty liberally in favor of the Indians and resolving
ambiguities in their favor, this court stated that it did

> not construe the term "reside" narrowly to cover
> only the exclusion of non-Native Americans from
> occupying reservation land. . . . [T]he Treaty was
> designed to provide them land where they would be
> able to separate themselves from non-Native Ameri-
> cans. The Tribe's English vocabulary at the time the
> Treaty was entered into was extremely limited. Read

within the context of the entire Treaty and in light of the history of Native American relations, the provision sets forth a general right of exclusion.

*Id.* at 185.

This court then determined whether the general right of exclusion barred application of OSHA to the sawmill. This court noted that in *Coeur d'Alene* we had

recognized that Native Americans possess an inherent sovereign right, independent of express treaty language, to exclude non-Native Americans from their reservation. This right, which is analogous to the general right of exclusion contained in the Treaty, was insufficient to bar application of the Act. The identical right should not have a different effect because it arises from general treaty language rather than recognized, inherent sovereign rights.

*Id.* at 186. This court also noted that our previous decisions of *Confederated Tribes of Warm Springs Reservation of Or. v. Kurtz*, 691 F.2d 878 (9th Cir. 1982) and *United States v. Farris*, 624 F.2d 890 (9th Cir. 1980), *superceded by statute*, Indian Gaming Regulatory Act of 1988, Pub. L. No. 100-497, 102 Stat. 2467, *as recognized in United States v. E.C. Investments, Inc.*, 77 F.3d 327 (9th Cir. 1996), implicitly ruled that the federal government was authorized to enter reservation land where taxable articles are kept, and that federal officers were authorized to enforce the gambling prohibition by entering reservation property. *Occupational Safety & Health Review Comm'n*, 935 F2d at 185-86.

Therefore, this court held that because OSHA was a generally applicable statute, the conflict between the tribe's treaty right to exclude and the limited entry necessary to enforce OSHA did not bar application of OSHA to the sawmill. *Id.* at 186. This court stated that were it to find otherwise, "the

enforcement of nearly all generally applicable federal laws would be nullified." *Id.* at 187.

**[9]** Accordingly, because the FLSA overtime provisions apply to the Mathesons, we conclude that the Secretary was authorized to make entry on to the reservation in order to locate records via her regular procedure in her effort to enforce the statute in question.

## B. Application of Puyallup Judicial Code

The Mathesons assert that pursuant to an agreement between the Puyallup Tribe and local governments, the Puyallup Tribal Judicial Code applies to disputes involving tribal members and those who have dealings on the reservation.

The Mathesons raised this argument for the first time in this appeal. In addition, the Mathesons attached only a portion of the agreement to their opening brief and there is no indication that it was part of the record in the district court. Accordingly, the Mathesons waived this argument. *See Raich v. Gonzales*, 500 F.3d 850, 869 (9th Cir. 2007) ("Because Raich did not raise this issue below . . . we hold that Raich's claim based on the plain language of the Controlled Substances Act is waived."); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("As a general rule, we will not consider arguments that are raised for the first time on appeal.").

## C.   Receivership

The Mathesons assert that the district court erred and violated their due process rights by appointing a receiver when there was no notice, argument, briefing, or prayer for relief in the Complaint regarding such appointment. The Mathesons also assert that the district failed to consider that appointment of a receiver divests the Tribe of its right to regulate collection.

**[10]** The appointment of a receiver is an equitable remedy that is usually specifically sought by a person who has an interest in a property. *See* 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE and PROCEDURE § 2983 (2d ed. 1997) [hereinafter FPP]. A receivership may interfere seriously with a defendant's property rights by ousting him or her from control. Therefore, "[t]he appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property." *Id.* § 2983, at 24; *see also Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.,* 999 F.2d 314, 316 (8th Cir. 1993).

**[11]** In general, a receiver should not be appointed without notice being given. *Tenn. Pub. Co. v. Carpenter,* 100 F.2d 728, 731 (6th Cir. 1938) ("It is of course the general rule that appointments of receivers are not made ex parte and without notice."); FPP § 2983, at 31. Receiverships are usually imposed for a judgment creditor only after a party has had an execution issued and returned unsatisfied. FPP § 2983, at 22. In determining whether a receiver should be appointed, courts often consider the following factors: whether the defendant engaged in fraudulent conduct, whether an imminent danger of loss of property exists, the inadequacy of available legal remedies, and harm to the plaintiff if the request for a receivership is denied. *Id.* § 2983, at 25-29.

**[12]** It is undisputed that the Complaint did not mention or plead any facts supporting receivership, and that it did not request receivership as a form of relief. It is also undisputed that the proposed judgment was the first instance in which a receivership was mentioned. The Secretary argues only that the Complaint requested "other further relief as may be necessary and appropriate" and that under the FLSA, the district court has equitable authority to authorize receivership.

This language in the Complaint, however, gives no notice whatsoever that a private business, owned by Indians and

located within a reservation, could be subject to receivership with broad powers granted to the receiver. In addition, the district court did not consider on the record any of the relevant factors before determining that it would automatically appoint a receiver immediately upon the Mathesons' failure to pay the back wages. For example, there was no finding that the Mathesons would refuse to pay, that they previously engaged in fraud, or that the property would dissipate and the property needed to be preserved for the Secretary's interests. Placing the Mathesons' business in receivership upon the failure to pay, with no opportunity for the Mathesons to respond to the appointment and powers of a receiver, and prior to any indication that the Mathesons would fail to pay, is premature. Since none of the facts show an urgent necessity or actual emergency warranting appointment of a receiver, the district court should have provided notice to the Mathesons that appointment of receiver was contemplated. *Cf. Maxwell v. Enterprise Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3rd Cir. 1942) ("The caution which should surround the appointment of a receiver is heightened when such appointment is sought peremptorily in a proceeding in which the opposition has neither notice nor opportunity to be heard. In case of 'actual emergency' it may be done."). In addition, the district court should have made findings on the relevant factors to support the appointment of a receiver.

**[13]** The district court was correct that it has authority to order a receivership, but only after evidence has been presented and findings made showing the necessity of a receivership. For this reason, we vacate the automatic appointment of a receiver upon a failure to pay.

We AFFIRM the district court's decision with respect to the application of the FLSA to the Mathesons and the right of the Secretary to audit the books. We VACATE the portion of the Judgment regarding the automatic appointment of a receiver if the Mathesons fail to pay. Should the Mathesons fail to pay the amount listed in the Judgment, the Secretary

may seek on proper showing the appointment of a receiver in the district court.

Each party to bear their own fees and costs.

**Affirmed in part and Vacated in part.**