RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

*v.*

No. 14-2239

LITTLE RIVER BAND OF OTTAWA INDIANS TRIBAL
GOVERNMENT,

*Respondent*.

On Application for Enforcement of an Order of the
National Labor Relations Board.
No. 7-CA-51156.

Decided and Filed: June 9, 2015

Before: MERRITT, GIBBONS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Kira Dellinger Vol, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Kaighn Smith, Jr., DRUMMOND WOODSUM, Portland, Maine, for Respondent.

GIBBONS, J., delivered the opinion of the court in which MERRITT, J., joined. McKEAGUE, J. (pp. 25–38), delivered a separate dissenting opinion.

1

———————

**OPINION**

———————

JULIA SMITH GIBBONS, Circuit Judge.  In this case, we are called on to decide whether the National Labor Relations Board may apply the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169, to the operation of a casino resort of the Little River Band of Ottawa Indians.  The Band's tribal council enacted an ordinance to regulate employment and labor-organizing activities of its employees, including casino employees, most of whom are not members of the Band.  The Board issued an order to the Band to cease and desist from enforcing the provisions that conflict with the NLRA.  We hold that because the NLRA applies to the Band's operation of the casino, the Board had jurisdiction to issue the cease and desist order.  Accordingly, we grant the Board's application for enforcement of the order.

I.

The Band is a federally recognized Indian tribe with more than 4,000 enrolled members, most of whom live within or near the Band's aboriginal lands in the State of Michigan.  *See* Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa Indians Act (the Little Bands Act), 25 U.S.C. § 1300k–2(a).  Pursuant to the Little Bands Act and the Indian Reorganization Act, 25 U.S.C. § 476, the Band enacted a constitution and amendments thereto, which have been approved by the Secretary of the Interior.  The Band's constitution vests the Band's legislative powers in the Tribal Council and grants power to the Tribal Council to operate gaming pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721.

Pursuant to the IGRA, the Band entered into a compact with the State of Michigan to conduct class III gaming activities, as defined by 25 U.S.C. § 2703(8), on the Band's trust lands in Manistee, Michigan.  The gross revenues from the Little River Casino Resort, a tribally-chartered, subordinate organization of the Band, exceed $20 million annually.  According to the IGRA, the net revenues from the casino may be used only to fund the Band's tribal governmental operations or programs, to provide for the general welfare of the Band and its members, to promote tribal economic development, to donate to charitable organizations, or to help support

the operations of local government. *See* 25 U.S.C. § 2710(b)(2)(B). The revenues from the casino provide over fifty percent of the Band's total budget.

The record in this case shows that the casino has 905 employees—107 of whom are enrolled members of the Band, 27 of whom are members of other Indian tribes, and 771 of whom are neither members of the Band nor of any other Indian tribe. The majority of casino employees live outside the Band's trust lands, and the majority of the casino's customers are not members of Indian tribes. Apart from the casino, 245 employees currently work for the Band's other governmental departments and subordinate organizations. Of this number, 108 are members of the Band and 137 are not members of the Band. In sum, of the Band's 1,150 total employees, 908 are not members of the Band.

In 2005, the Tribal Council enacted the Band's Fair Employment Practices Code (FEPC), which it amended most recently on July 28, 2010. In pertinent part, the FEPC contains Article XVI, "Labor Organizations and Collective Bargaining," and Article XVII, "Integrity of Fair Employment Practices Code," which regulate labor-organizing activities and collective bargaining. These articles apply to casino employees and labor organizations representing or seeking to represent casino employees. As amended, Article XVI, *inter alia*, grants to the Band the authority to determine the terms and conditions under which collective bargaining may or may not occur; prohibits strikes, work stoppage, or slowdown by the Band's employees and, specifically, by casino employees; prohibits the encouragement and support by labor organizations of employee strikes; prohibits any strike, picketing, boycott, or any other action by a labor organization to induce the Band to enter into an agreement; subjects labor organizations and employees to civil penalties for strike activity; subjects employees to suspension or termination for strike activity; subjects labor organizations to decertification for strike activity; subjects labor organizations to a ban on entry to tribal lands for strike activity; and requires labor organizations doing business within the jurisdiction of the Band to apply for and obtain a license. Article XVI also precludes collective bargaining over the Band's decisions to hire, lay off, recall, or reorganize the duties of its employees; precludes collective bargaining over any subjects that conflict with the Band's tribal laws; exempts the Band from the duty to bargain in good faith over the terms and conditions under which the Band's employees may be tested for alcohol and

drug use; limits the duration of collective bargaining agreements to three years or less; provides that decisions by the Band, through its Tribal Court, over disputes involving the duty to bargain in good faith or alleged conflicts between a collective-bargaining agreement and tribal laws shall be final and not subject to appeal; and limits the period of time during which employees may file a deauthorization petition. Further, Article XVI prohibits the requirement of membership in a labor organization as a condition of employment. It also prohibits the deduction of union dues, fees, or assessments from the wages of employees unless the employee has presented, and the Band has received, a signed authorization of such deduction. As amended, Article XVII prohibits Band employers, such as the casino, from giving testimony or producing documents in response to requests or subpoenas issued by non-tribal authorities engaged in investigations or proceedings on behalf of current or former employees, when such employees have failed to exhaust their remedies under the FEPC.

On March 28, 2008, the Teamsters, Local No. 406, filed a Charge Against Employer, asserting that the Band committed an unfair labor practice in violation of the NLRA. On December 10, 2010, the Acting General Counsel of the Board filed an unfair labor practice complaint, alleging that the above provisions of Articles XVI and XVII of the FEPC interfere with, restrain, and coerce employees in the exercise of their rights guaranteed by Section 7 of the NLRA, 29 U.S.C. § 157, and therefore violate Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). In a proceeding before the Board, the parties stipulated that the only issues for decision were whether the Board has jurisdiction over the Band and, if so, whether the Band violated Section 8(a)(1) of the NLRA, by applying the above provisions of the FEPC. *Little River Band of Ottawa Indians Tribal Gov't*, 359 N.L.R.B. No. 84, slip op. at 2 (2013). The only argument the Band presented in its defense was that the Board lacked jurisdiction because the application of the NLRA would impermissibly interfere with the Band's inherent tribal sovereignty to regulate labor relations on its tribal lands.

The Board concluded it had jurisdiction, held that the Band violated the NLRA as alleged, and issued a cease and desist order. *Little River*, 359 N.L.R.B. No. 84, slip op. at 3–6. In reaching this decision, the Board applied its holding in *San Manuel Indian Bingo & Casino*, 341 N.L.R.B. 1055 (2004), *aff'd*, 475 F.3d 1306 (D.C. Cir. 2007), in which it decided the merits

of a similar jurisdictional challenge. *Little River*, 359 N.L.R.B. No. 84, slip op. at 2–3. In *San Manuel*, the Board adopted a framework to determine whether federal Indian law or policy constrains its jurisdiction. 341 N.L.R.B. at 1059−62. That framework begins with the statement from *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99 (1960), that "a general statute in terms applying to all persons includes Indians and their property interests." 341 N.L.R.B. at 1059 (quoting *Tuscarora*, 362 U.S. at 116). In *San Manuel*, the Board noted three exceptions to the *Tuscarora* principle, which were first enumerated by the Ninth Circuit in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir. 1985). 341 N.L.R.B. at 1059 (citing *Coeur d'Alene*, 751 F.2d at 1116). The Board followed this approach, holding that general statutes do not apply to Indian tribes if: "(1) the law 'touches exclusive rights of self-government in purely intramural matters'; (2) application of the law would abrogate treaty rights; or (3) there is 'proof' in the statutory language or legislative history that Congress did not intend the law to apply to Indian tribes." 359 N.L.R.B. No. 84, slip op. at 3 (quoting *Coeur d'Alene*, 751 F.2d at 1116). "In any of these situations, Congress must expressly apply a statute to Indians before . . . it reaches them." *Id.* (alteration in original) (citing *Coeur d'Alene*, 751 F.2d at 1116). Applying this framework, the Board determined that application of the NLRA to the casino would not interfere with the Band's "exclusive rights of self-government in purely intramural matters." *Id.* The Board also found the second and third *Coeur d'Alene* exceptions inapplicable. *Id.* The Board saw "no merit in [the Band's] central contention—that Federal scrutiny of its FEP Code improperly impairs the exercise of the Tribe's sovereign right of self-government." *Id.* at 4. The Board also applied a discretionary jurisdictional standard intended "to balance the Board's interest in effectuating the policies of the [NLRA] with the need to accommodate the unique status of Indians in our society and legal culture." *Id.* at 4 (citing *San Manuel*, 341 N.L.R.B. at 1063). The Board found "that policy considerations weigh in favor of the Board asserting its discretionary jurisdiction." *Id.* The Board accordingly ordered the Band to cease and desist from applying specific provisions of Articles XVI and XVII of the FEPC to employees of the casino, or any labor organization that may represent those employees, and from interfering with employees in the exercise of their rights guaranteed by Section 7 of the NLRA, 29 U.S.C. § 157. *Id.* at 6. The Band petitioned for review, and the Board cross-appealed for enforcement of its order.

We heard oral argument in this case on October 8, 2013. The Board subsequently moved to vacate its order, to remand for further consideration in light of the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). We granted the Board's motion. A properly constituted panel of the Board considered the case and issued a decision and order against the Band on September 15, 2014, stating that "we have . . . considered de novo the stipulated record and the parties' briefs. We have also considered the now-vacated Decision and Order, and we agree with the rationale set forth therein." 361 N.L.R.B. No. 45, slip op. at 1 (2014).

The Board then reinitiated this appeal with an application for enforcement of its order. The application focuses our inquiry on the single issue of whether the Board may assert jurisdiction over the Band to enforce the cease and desist order. In deciding this case, we have considered the briefs and arguments from the prior appeal (Nos. 13-1464 and 13-1583).

II.

The NLRA is a statute of general applicability and is silent as to Indian tribes. *See* 29 U.S.C. §§ 152(1)–(2), 158(a), 160(a). The NLRA prohibits "employers" from engaging in unfair labor practices. 29 U.S.C. § 158(a). The NLRA creates the Board's jurisdiction, empowering it "to prevent any person from engaging in any unfair labor practice affecting commerce." 29 U.S.C. § 160(a). The NLRA defines both "person" and "employer" in general and expansive terms. The definitions of both "person" and "employer" provide a list of entities which those terms cover and, in the case of "employer," do not cover. *See* 29 U.S.C. § 152(1); § 152(2). In both cases, the lists are illustrative, not exhaustive, and neither definition mentions Indian tribes.

From one vantage, then, this case is about whether the pertinent statutory terms "employer" and "person," which trigger the Board's jurisdiction, encompass Indian tribes. Since Congress has not "directly spoken to the precise issue," *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984), it would seem that Congress has implicitly delegated to the Board the authority to determine the circumstances under which the statutory term "employer" extends to Indian tribes. Under *Chevron*, if the Board's interpretation is "a permissible construction of the statute," 467 U.S. at 843, we give it "controlling weight," *id.*

at 844.  The Board sees the case in this light: it interprets the NLRA's definition of "employer" to cover Indian tribes and argues that its construction is reasonable.

From another angle, however, this case concerns the limits and contours of inherent tribal sovereignty and the proper interpretation of the silence of a generally applicable congressional statute against the background of federal Indian law.  The Band submits that under principles of federal Indian law the NLRA, like any other congressional enactment, cannot preempt a tribal government's exercise of its inherent sovereign authority without a clear expression from Congress.  The Board responds that congressional statutes of general applicability that are silent as to Indian tribes, like the NLRA, apply to Indian tribes, unless such application abrogates rights guaranteed by Indian treaties or interferes with exclusive rights of self-governance in purely intramural matters.  Central to the argument for its construction, the Board claims that the *San Manuel* standard follows from judicial opinions expounding federal Indian law and accommodates federal Indian policies.  *See Little River*, 359 N.L.R.B. No. 84, slip op. at 3–4; *San Manuel*, 341 N.L.R.B. at 1063.  Thus, the Board's arguments for the reasonableness of its construction of its jurisdictional terms are predicated on its analysis of federal Indian law and policy.

From this viewpoint, we find that *Chevron* does not apply.  A reviewing court does not owe *Chevron* deference to an agency construction if the agency adopts the construction on the basis of a judicial opinion and not on the basis of policy considerations regarding the statute it administers.  *See, e.g.*, *Akins v. F.E.C.*, 101 F.3d 731, 740 (D.C. Cir. 1996) (*en banc*), *vacated on other grounds*, 524 U.S. 11 (1998); *see also* Richard J. Pierce Jr., *Administrative Law Treatise*, § 3.5, at 200 (5th ed. 2010).  Moreover, federal Indian law and policy are areas over which the Board has no particular expertise, and so we need not defer to the Board's conclusions with respect to them.  *Cf. Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 143–44 (2002); *see also San Manuel*, 475 F.3d at 1312.  In *San Manuel*, the D.C. Circuit attempted to separate questions of tribal sovereignty, which it reviewed *de novo*, from questions about the Board's construction of the term "employer," which it reviewed under *Chevron*.  *See* 475 F.3d at 1311−12, 1315–16.  In this case, however, considerations of federal Indian law suffuse every branch of the analysis concerning the application of the NLRA to the casino.  At its heart, the

question before us is not one of policy, but one of law. We are asked to decide whether federal Indian law forecloses the application of the NLRA to the Band's operation of its casino and regulation of its employees, and we do so *de novo*.

III.

A.

We begin by reviewing the law governing the implicit divestiture of tribal sovereignty, which provides an important background when determining whether federal laws of general applicability also apply to Indian tribes absent an express congressional statement. Indian tribes are "distinct, independent political communities." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008) (quoting *Worcester v. Georgia*, 31 U.S. 515, 559 (1832)). The powers they possess "stem from three sources: federal statutes, treaties, and the tribe's inherent sovereignty." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 168 (1982) (Stevens, J., dissenting). Inherent tribal sovereignty preexisted the founding; it "is neither derived from nor protected by the Constitution." *Id.* Indian tribes' "incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised." *United States v. Wheeler*, 435 U.S. 313, 323 (1978) (quoting *United States v. Kagama*, 118 U.S. 375, 381 (1886)). The Tenth Amendment does not refer to Indian tribes in its reservations of power not delegated to the United States. *See* U.S. Const. amend. X; *see also Merrion*, 455 U.S. at 168 n.17 (Stevens, J., dissenting). As such, the sovereignty of Indian tribes "exists only at the sufferance of Congress and is subject to complete defeasance." *Wheeler,* 435 U.S. at 323.

Indian tribes retain broad residual power over intramural affairs: they may determine tribal membership, regulate domestic relations among members, prescribe rules of inheritance among members, and punish tribal offenders. *Montana v. United States*, 450 U.S. 544, 564 (1981). "They may also exclude outsiders from entering tribal land." *Plains Commerce*, 554 U.S. at 327−28 (citing *Duro v. Reina*, 495 U.S. 676, 696−97 (1990)). "Conversely, when a tribal government goes beyond matters of internal self-governance and enters into an off-reservation

business transaction with non-Indians, its claim of sovereignty is at its weakest." *San Manuel*, 475 F.3d at 1312–13 (citing *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49 (1973)).

The Supreme Court has long been suspicious of tribal authority to regulate the activities of non-members and is apt to view such power as implicitly divested, even in the absence of congressional action. *See Plains Commerce*, 554 U.S. at 328 ("[T]he tribes have, by virtue of their incorporation into the American republic, lost 'the right of governing . . . person[s] within their limits except themselves.'" (second and third alteration in original) (quoting *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209 (1978))); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.02(3), at 226−42 (Nell Jessup Newton ed., 2012) (hereinafter COHEN'S HANDBOOK).  The Supreme Court has found implicit divestiture in areas of tribal criminal jurisdiction, *see Oliphant*, 435 U.S. at 195, civil legislative jurisdiction, *see Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659 (2001); *Montana*, 450 U.S. at 557, and civil adjudicative jurisdiction, *see Plains Commerce*, 554 U.S. at 336, 341; *Nevada v. Hicks*, 533 U.S. 353, 357−58 (2001); *Strate v. A-1 Contractors*, 520 U.S. 438, 456−59 (1997).

*Montana* charts the contemporary law of implicit divestiture of inherent tribal sovereignty.  *See* 450 U.S. at 565−66.  *Montana* held that the inherent sovereignty of the Crow Indian Tribe did not encompass regulation of non-Indian fishing and hunting on reservation land owned in fee by non-members of the tribe.  *See id.* at 557.  In addressing the claim that the tribe's residual inherent sovereignty included such power, the *Montana* Court set forth "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of the tribe." *Id.* at 565 (citing *Oliphant*, 435 U.S. at 209).  *Montana* carved out two exceptions to this rule.  First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of non-members who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  450 U.S. at 565.  Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566.  *Montana* made plain that tribal power over non-members extends only as far as "necessary to protect tribal self-government or to control internal relations." *Id.* at 564.  Any

exercise of tribal power over non-members beyond that point "is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.* The Supreme Court has called *Montana* a "pathmarking case" on the subject of Indian tribes' regulatory authority over non-members. *See Hicks*, 533 U.S. at 358 (citing *Strate*, 520 U.S. at 445).

In *Hicks* and *Plains Commerce*, the Court further demarcated the bounds on tribal sovereignty to regulate the activities of non-members. *Hicks* held that a tribe's inherent sovereignty does not extend to the regulation of state wardens executing a search warrant for evidence of an off-reservation violation of state law. 533 U.S. at 364. The Supreme Court rejected that such regulation is essential to tribal self-government or internal relations and held that the tribe's inherent sovereignty does not encompass regulatory and adjudicatory jurisdiction over state officers. *See id.* at 364, 374. Applying *Montana*, the *Hicks* Court "explained that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which *Montana* referred: tribes have authority '[to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.'" *Id.* at 360–61 (alterations in original) (quoting *Strate*, 520 U.S. at 459). Thus, *Hicks* narrowly draws the boundary of residual inherent sovereignty. *See id.* "Tribal assertion of regulatory authority over non-members must be connected to that right of the Indians to make their own laws and be governed by them." *Id.* at 361.

Further, the *Hicks* Court diluted the claim that tribal sovereignty to regulate the activities of non-members necessarily flows from the power to exclude outsiders from entering tribal land. The Court denied "that Indian ownership suspends the 'general proposition' derived from *Oliphant* that 'the inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of the tribe' except to the extent 'necessary to protect tribal self-government or to control internal relations.'" *Id.* at 359 (quoting *Montana*, 450 U.S. at 564−65). As the *Hicks* court explained, "[t]he ownership status of land . . . is only one factor to consider in determining whether regulation of the activities of non-members is 'necessary to protect tribal self-government or to control internal relations.'" *Id.*

Similarly, in *Plains Commerce*, the Court held that a tribal court lacked jurisdiction to adjudicate a discrimination claim concerning a non-Indian bank's sale of fee land because "regulating the sale of non-Indian fee land" is not related to the sovereign interests of protecting tribal self-government or controlling internal relations. *See* 554 U.S. at 330, 336, 341. The *Plains Commerce* Court narrowed the ambit of *Montana*'s exceptions to be congruent with those interests, noting that "[t]hese exceptions are limited ones and cannot be construed in a manner that would swallow the rule or severely shrink it." *Id.* at 330 (citations omitted) (internal quotation marks omitted). The Supreme Court also clarified that the burden rests on the tribe to establish an exception to *Montana*'s general rule. *Id.* (citing *Atkinson*, 532 U.S. at 654).

*Hicks* and *Plains Commerce* demonstrate that the application of the *Montana* framework is guided by an overarching principle: inherent tribal sovereignty has a core and a periphery. At the periphery, the power to regulate the activities of non-members is constrained, extending only so far as "necessary to protect tribal self-government or to control internal relations." *Montana*, 450 U.S. at 564. Tribal regulations of non-member activities must "flow directly from these limited sovereign interests." *Plains Commerce*, 544 U.S. at 335.

B.

The Supreme Court has anticipated that federal statutes of general applicability may implicitly divest Indian tribes of their sovereign power to regulate the activities of non-members. *See Tuscarora*, 362 U.S. at 115–17. In *Tuscarora*, the Supreme Court declared that "it is now well settled by many decisions of this Court that a general [federal] statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at 116. *Tuscarora* presented the question of whether a portion of the Tuscarora Indian Nation's lands could be condemned under the eminent domain powers of § 21 of the Federal Power Act, 16 U.S.C. §§ 836, 836a (2012). *Id.* at 115. The Tuscarora Indian Nation, relying on *Elk v. Wilkins*, 112 U.S. 94 (1884), "argue[d] that § 21, being only a general act of Congress, does not apply to Indians or their lands." 362 U.S. at 115. The Supreme Court explicitly rejected this argument, citing decisions holding that generally applicable federal statutes presumptively reach the property interests of individual members of Indians tribes where no provision "indicates that Indians are to be

excepted." *Id.* at 116–17 (citing *Okla. Tax Comm'n v. United States*, 319 U.S. 598, 607 (1943); *Superintendent of Five Civilized Tribes v. Comm'r*, 295 U.S. 418, 419–20 (1935)).  The *Tuscarora* Court extended these decisions applying general federal statutes to individual members of Indian tribes to hold that the eminent domain powers of the Federal Power Act, a statute creating a comprehensive regulatory scheme, reached lands purchased and owned in fee simple by the Tuscarora Indian Nation.  *See id.* at 118.[1]

Our sister circuits have long read *Tuscarora* for the proposition that a federal statute creating a comprehensive regulatory scheme presumptively applies to Indian tribes.  *See, e.g.*, *Solis v. Matheson*, 563 F.3d 425, 430 (9th Cir. 2009); *United States v. Mitchell*, 502 F.3d 931, 947−48 (9th Cir. 2007); *NLRB v. Chapa De Indian Health Program, Inc.*, 316 F.3d 995, 998−99 (9th Cir. 2003); *Taylor v. Ala. Intertribal Council Title IV J.T.P.A.*, 261 F.3d 1032, 1034−35 (11th Cir. 2001); *United States v. Wadena*, 152 F.3d 831, 841−42 (8th Cir. 1998); *Cook v. United States*, 86 F.3d 1095, 1097 (Fed. Cir. 1996); *United States v. Funmaker*, 10 F.3d 1327, 1330−31 (7th Cir. 1993); *E.E.O.C. v. Fond du Lac Heavy Equip. & Const. Co., Inc.*, 986 F.2d 246, 248 (8th Cir. 1993); *U.S. Dep't of Labor v. Occupational Safety & Health Review Comm'n*, 935 F.2d 182, 183−84 (9th Cir. 1991); *United States v. White*, 508 F.2d 453, 455 (8th Cir. 1974).

We stress that the application of general federal statutes to Indian tribes is presumptive; they do not always apply.  *See, e.g.*, *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024 (2014).  Our sister circuits have developed and employed a test, set forth in *Coeur d'Alene*, to determine the exceptions to the presumptive application of a general federal statute.  *See* 751 F.2d at 1116.  In *Coeur d'Alene*, the Ninth Circuit held that the Occupational Safety and Health Act ("OSHA") applied to commercial activities carried out by an Indian tribal farm that employed some non-

---

[1]*Merrion* also suggests that federal statutes of general applicability may implicitly divest Indian tribes of their sovereign power to regulate the activities of non-members.  *See Merrion*, 455 U.S. at 152.  Before concluding that there was no indication that the tribe's power to enact an ordinance taxing non-member removal of oil and natural gas from tribal lands had been abrogated by Congress, the *Merrion* Court examined whether any particular provision in two federal statutes "deprived the Tribe of its authority to impose the severance tax."  455 U.S. at 149.  After reviewing the text and legislative history of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3320(a), (c)(1), *repealed by* Pub. L. No. 101-60, § 2(b), 103 Stat. 158 (1989), the Court found "no 'clear indications' that Congress has *implicitly deprived* the Tribe of its power to impose the severance tax."  *Id.* at 152 (emphasis added).  Although the Court held that Congress had not implicitly divested the tribe of its authority to impose a severance tax, the Court's analysis presumes that Congress could do so.  *See id.* at 152; *see also Pueblo of San Juan*, 276 F.3d 1186, 1204 (10th Cir. 2002) (en banc) (Murphy, J., dissenting).

member workers and was similar in its operation to other farms in the area.  751 F.2d at 1114. The court rejected the notion that "congressional silence should be taken as an expression of intent to exclude tribal enterprises from the scope of an Act to which they would be subject otherwise." *Id.* at 1115.  Citing *Tuscarora*, the court applied the presumption that "federal laws generally applicable throughout the United States apply with equal force to Indians on reservations." *Id.* (quoting *United States v. Farris*, 624 F.2d 890, 893 (9th Cir. 1980)).  The court, however, held that this presumption is limited by three exceptions.

> A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations.

*Id.* at 1116 (internal quotations omitted).  "In any of these three situations, Congress must *expressly* apply a statute to Indians before . . . it reaches them." *Id.* (emphasis original).  Because the tribe could not show that the application of OSHA regulations to its commercial farm fell within one of these three exceptions, the court held that OSHA applied.  *See id.* at 1116–18.

Our sister circuits have employed the framework set forth in *Coeur d'Alene* to conclude that aspects of inherent tribal sovereignty can be implicitly divested by comprehensive federal regulatory schemes that are silent as to Indian tribes.  *See, e.g.*, *Menominee Tribal Enters. v. Solis*, 601 F.3d 669, 674 (7th Cir. 2010) (holding that OSHA applied to tribe's operation of a sawmill and related commercial activities); *Fla. Paraplegic Ass'n v. Miccosukee Tribe of Indians*, 166 F.3d 1126, 1128–30 (11th Cir. 1999) (holding Title III of the Americans with Disabilities Act applied to tribe's restaurant and gaming facility); *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 177–82 (2d Cir. 1996) (holding that OSHA applied to Indian tribe's construction business which operated only within confines of reservation); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 932–36 (7th Cir. 1989) (applying Employee Retirement Income Security Act to tribal employee benefits plan because statute did not affect tribe's ability to govern itself in intramural matters); *see also Navajo Tribe v. NLRB*, 288 F.2d 162, 165 (D.C. Cir. 1961) (holding that NLRA applies to employers located on reservation lands); *cf. EEOC v. Fond du*

*Lac Heavy Equip. & Constr. Co.*, 986 F.2d 246, 249 (8th Cir. 1993) (holding that Age Discrimination in Employment Act, although generally applicable to Indian tribes, does not apply to employment discrimination action involving member of Indian tribe, tribe as employer, and reservation employment because "dispute involves a strictly internal matter" and application would affect "tribe's specific right of self-government"); *but see Pueblo of San Juan*, 276 F.3d at 1199 (holding that federal statutes of general applicability do not apply where Indian tribe has exercised its authority as sovereign).

C.

The Band contends that the *Coeur d'Alene* framework insufficiently protects inherent tribal sovereignty. According to the Band, generally applicable congressional statutes cannot preempt any exercise of a tribal government's inherent sovereign authority without a clear expression from Congress. We are not persuaded.

The Band principally cites *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9 (1987), and *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978), for its contention. In *Iowa Mutual*, the Supreme Court refused to read the statute granting federal diversity jurisdiction, 28 U.S.C. § 1332, which is silent as to Indian tribes, to nullify the requirement that tribal court remedies must be exhausted before a federal district court could assert jurisdiction. *See* 480 U.S. at 18. The Court cited the absence of clear congressional intent to the contrary. *Id.* at 17–18. And in *Santa Clara Pueblo*, the Supreme Court held that Title I of the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302, does not implicitly authorize a private cause of action for declaratory and injunctive relief against a tribal officer. 436 U.S. at 72. There, a female member brought an action in federal district court, alleging that a tribal ordinance denying membership to children of female members who married outside of the tribe, but not to similarly situated children of male members, violated Title I. *Id.* at 52–53. The Court found that construing § 1302 to create an implicit private right of action would interfere with tribal self-government beyond the interference expressly called for by the statute. *Id.* at 59. Out of respect for tribal sovereignty and the plenary power of Congress, the Court reasoned that the statutory scheme and legislative

history suggested that Congress's refusal to provide remedies other than *habeas corpus* was deliberate. *Id.* at 61.

To be sure, each decision declined to read a congressional statute in a way that would undermine central aspects of tribal self-government absent a clear statement that it was Congress's intent to do so. But these decisions hardly show that *every* congressional statute of general applicability that would conflict with *any* tribal regulation of the activities of non-members must be accompanied by a clear statement if that federal statute is to apply. We do not even accord the sovereign powers of the several states—which, unlike the sovereign powers of Indian tribes, are constitutionally protected—with such solicitude. *See, e.g.*, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (discussing doctrine of implied preemption); *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) ("[A]cts of the State Legislatures . . . enacted in the execution of acknowledged State powers, [that] interfere with, or are contrary to the laws of Congress . . . must yield to [the latter].").

Comprehensive federal regulatory schemes that are silent as to Indian tribes can divest aspects of inherent tribal sovereignty to govern the activities of non-members. We do not doubt that "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *Wheeler*, 435 U.S. at 323. Yet, such residual sovereignty is "unique and limited." *Id.* As explained above, the Supreme Court has held several aspects of tribal sovereignty to regulate the activities of non-members to be implicitly divested, even in the absence of congressional action, and it is axiomatic that tribal sovereignty is "subject to complete defeasance" by Congress. It would be anomalous if certain aspects of tribal sovereignty—namely, specific powers to regulate some non-member activities—are implicitly divested in the absence of congressional action, *see generally* COHEN'S HANDBOOK §4.02(3), at 226−42, but those same aspects of sovereignty could not be implicitly divested by generally applicable congressional statutes.

For these reasons, we do not agree with the Band's reliance on *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002) (*en banc*), in which the Tenth Circuit held that federal statutes of general applicability do not presumptively apply "where an Indian tribe has exercised

its authority as a sovereign . . . rather than in a proprietary capacity such as that of employer or landowner." *Id.* at 1199. The Band reads *Pueblo of San Juan* to suggest that Indian tribes may avoid the presumptive application of a comprehensive federal regulatory scheme by enacting an ordinance regulating the activities of non-members that directly conflicts with the federal statute. But, again, this cannot be the rule. Tribal regulations of the activities of non-members are enacted at the frontier of tribal sovereignty. *See Plains Commerce*, 554 U.S. at 328; *Montana*, 450 U.S. at 564. Again, not even the states—whose sovereign powers are explicitly protected by the Tenth Amendment—may avoid the application of federal law by enacting directly conflicting legislation. *See* U.S. Const. art. VI, cl. 2; *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985); *see also Pueblo of San Juan*, 276 F.3d at 1205 (Murphy, J., dissenting). "The tribes' retained sovereignty reaches only that power 'needed to control . . . internal relations[,] . . . preserve their own unique customs and social order[, and] . . . prescribe and enforce rules of conduct for [their] own members.'" *Mashantucket Sand & Gravel*, 95 F.3d at 178 (alterations in original) (quoting *Duro*, 495 U.S. at 685–86). A clear statement is required for a statute to undermine central aspects of tribal self-government—that is, a tribe's ability to govern its own members. *See Iowa Mut.*, 480 U.S. at 17–18; *Santa Clara Pueblo*, 436 U.S. at 59–61; *see also Bay Mills*, 134 S. Ct. at 2031–32 (describing the "enduring principle of Indian law" that "courts will not lightly assume that Congress in fact intends to undermine Indian self-government," and holding that tribal immunity from suit is a central aspect of self-government that requires a clear statement by Congress if it is to be abrogated). A clear statement is not required, however, for a federal statute of general applicability creating a comprehensive regulatory scheme to apply to a tribe's regulation of the activities of non-members where such regulation is not necessary to the preservation of tribal self-government. The Band suggests that every federal statute that fails to expressly mention Indian tribes would not apply to them. Contrary to the Band's proposed rule, the nature and limits of residual tribal sovereignty entail the presumption that federal statutes apply to Indian tribes' regulation of the activities of non-members where such tribal regulation is not "necessary to protect tribal self-government or to control internal relations." *See Montana*, 450 U.S. at 564.

The Band also points to the separate canon of construction that ambiguities in a federal statute must be resolved in favor of Indians. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Div. of Mich.*, 369 F.3d 960, 971 (6th Cir. 2004). But "canons are not mandatory rules[;] they are guides that 'need not be conclusive.'" *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001)). The Band asserts that this canon is "rooted in the unique trust relationship between the United States and the Indians." *See Grand Traverse Band*, 369 F.3d at 971 (quoting *Blackfeet Tribe,* 471 U.S. at 766). But it does not undermine that trust relationship to presumptively apply a federal statute of general applicability to a tribe's regulation of the activities of non-members where the tribal regulation is not necessary to the preservation of tribal self-government. *See Montana,* 450 U.S. at 564; *Wheeler*, 435 U.S. at 323. Furthermore, the cases the Band cites in support of the canon that statutory ambiguities must be construed in favor of Indians involved a statute or provision of a statute that Congress enacted specifically for the benefit of Indians or for the regulation of Indian affairs. *See, e.g.*, *Blackfeet*, 471 U.S. at 766 (Indian Mineral Leasing Acts of 1924 and 1938); *Grand Traverse Band*, 369 F.3d at 971 (IGRA). Like the D.C. Circuit, we have found no case in which the Supreme Court applied this canon to resolve an ambiguity in a statute of general application silent as to Indians, like the NLRA. *See San Manuel*, 475 F.3d at 1312.

D.

We find that the *Coeur d'Alene* framework accommodates principles of federal and tribal sovereignty. *See Mashantucket Sand & Gravel*, 95 F.3d at 179; *Pueblo of San Juan*, 276 F.3d at 1206 (Murphy, J., dissenting) ("A limited notion of tribal self-governance preserves federal supremacy over Indian tribes while providing heightened protection for tribal regulation of purely intramural matters. Any concerns about abrogating tribal powers . . . are fully addressed by the *Coeur d'Alene* exceptions."). The *Coeur d'Alene* framework reflects the teachings of *Montana*, *Iowa Mutual*, and *Santa Clara Pueblo*: there is a stark divide between tribal power to govern the identity and conduct of its membership, on the one hand, and to regulate the activities of non-members, on the other. The *Coeur d'Alene* framework begins with a presumption that generally applicable federal statutes also apply to Indian tribes, reflecting Congress's power to

modify or even extinguish tribal power to regulate the activities of members and non-members alike. *See* 751 F.2d at 1115; *cf. Montana*, 450 U.S. at 557. The exceptions enumerated by *Coeur d'Alene* then supply Indian tribes with the opportunity to show that a generally applicable federal statute should not apply to them. The first exception incorporates the teachings of *Iowa Mutual* and *Santa Clara Pueblo* that if a federal statute were to undermine a central aspect of tribal self-government, then a clear statement would be required. By this mechanism, the *Coeur d'Alene* framework preserves "the unique trust relationship between the United States and the Indians." *Grand Traverse Band*, 369 F.3d at 971 (quoting *Blackfeet Tribe*, 471 U.S. at 766). We therefore adopt the *Coeur d'Alene* framework to resolve this case.

IV.

The NLRA is a generally applicable, comprehensive federal statute. It prohibits "employers" from engaging in unfair labor practices and empowers the Board to prevent such practices. 29 U.S.C. §§ 158(a), 160(a). Congress has said that "[t]his power shall not be affected by any other means of adjustment or prevention that has been or may be established by law, or otherwise." § 160(a). The Supreme Court "has consistently declared that in passing the [NLRA], Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963) (citing *Guss v. Utah Labor Relations Bd.*, 353 U.S. 1, 3 (1957)). Under the *Coeur d'Alene* framework, since there is no treaty right at issue in this case, the NLRA applies to the Band's operation of the casino unless the Band can show either that the Board's exercise of jurisdiction "touches exclusive rights of self-governance in purely intramural matters" or that "there is proof by legislative history or some other means that Congress intended [the NLRA] not to apply to Indians on their reservations." 751 F.2d at 1116.

A.

The Band cannot show that application of the NLRA to the casino undermines "tribal self-governance in purely intramural matters." *Id.* The Band underscores the provisions of Articles XVI and XVII that regulate non-member employee strikes, the Band's duty to bargain in good faith over the terms and conditions under which the Band's employees may be tested for

alcohol and drug use, and the licensing of non-member labor organizations seeking to organize Band employees. The Band argues that these regulations in particular implicate its "right of self-governance in purely intramural affairs." *Coeur d'Alene*, 751 F.2d at 1116. The Band forwards two arguments for its contention that application of the NLRA undermines its right of self-governance: first, the regulations targeted by the Board's order protect the net revenues of the casino, which, pursuant to the IGRA, fund its tribal government. Second, the Band stresses that application of the NLRA would invalidate a regulation enacted and implemented by its Tribal Council.

The tribal self-governance exception is designed to except internal matters such as the conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes also apply to Indian tribes. *Id.* (citing *Farris*, 624 F.2d at 893); *cf. Montana*, 450 U.S. at 564 (holding that Indian tribes retain sovereign power to determine tribal membership, to regulate domestic relations among members, to prescribe rules of inheritance among members, and to punish tribal offenders). Intramural matters concern conduct the immediate ramifications of which are felt primarily within the reservation by members of the tribe. *Mashantucket Sand & Gravel*, 95 F.3d at 181. We find that Articles XVI and XVII, even the provisions the Band underscores, do not regulate purely intramural matters; rather, they principally regulate the labor-organizing activities of Band employees, and specifically of casino employees, most of whom are not Band members. For this reason, the Band's enactment of Articles XVI and XVII is unlike those exercises of tribal government that our sister circuits have found to concern purely intramural affairs. *See, e.g.*, *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 495 (7th Cir. 1993); *Fond du Lac*, 986 F.2d at 249.

In *Fond du Lac*, the court refused to apply ADEA to an employment discrimination action involving a tribe member, employed by the tribe on the reservation, because the "dispute involve[d] a strictly internal matter." 986 F.2d at 249. In *Great Lakes*, the court refused to apply the overtime requirements of the Fair Labor Standards Act to tribal law-enforcement officers. 4 F.3d at 495. The *Great Lakes* court distinguished tribal law-enforcement employees from tribal employees in other cases who "were engaged in routine activities of a commercial or

service character, namely lumbering and health care, rather than of a governmental character." *Id.* Further, the court explicitly did "not hold that employees of Indian agencies are exempt from the Fair Labor Standards Act." *Id.* Because Articles XVI and XVII regulate the activities of non-member, non-officer employees, the Band's reliance on *Fond du Lac* and *Great Lakes* is unavailing. Articles XVI and XVII are far removed from regulations of intramural matters envisioned by courts applying the first *Coeur d'Alene* exception. *See, e.g., Mashantucket Sand & Gravel*, 95 F.3d at 181; *Coeur d'Alene*, 751 F.2d at 1116.

The Band responds that Article XVI targets those non-member activities—particularly casino employee strikes and labor-organizing efforts—that jeopardize the revenues of its tribal government and thus threaten its tribal self-sufficiency. This argument overreaches. "A statute of general application will not be applied to an Indian Tribe when the statute threatens the Tribe's ability to govern its intramural affairs, but not simply whenever it merely affects self-governance as broadly conceived." *Smart*, 868 F.2d at 935. The right to conduct commercial enterprises free of federal regulation is not an aspect of tribal self-government. *See, e.g., Fla. Paraplegic Ass'n*, 166 F.3d at 1129 (finding tribal gaming facility "does not relate to the governmental functions of the Tribe"); *U.S. Dep't of Labor v. Occupational Safety & Health Review Comm'n (OSHRC)*, 935 F.2d 182, 184 (9th Cir. 1991) (citing *Coeur d'Alene*, 751 F.2d at 1116). And Indian tribes are not shielded from general federal statutes because the application of those statutes may incidentally affect the revenue streams of tribal commercial operations that fund tribal government. *See Coeur d'Alene*, 751 F.2d at 1116 (rejecting the argument that applying OSHA to tribal farm would interfere with right of self-government because "it would bring within the embrace of 'tribal self-government' all tribal business and commercial activity"); *see also Solis*, 601 F.3d at 671 (rejecting argument that tribal sawmill involved right of self-governance in purely intramural affairs because "[t]he Menominees' sawmill is just a sawmill, a commercial enterprise"); *OSHRC*, 935 F.2d at 184 (holding that although revenue from tribal lumber mill, which employed significant number of non-members and sold its products broadly in interstate commerce, was "critical to the tribal government, application of [OSHA] does not touch on the Tribe's 'exclusive rights of self-governance in purely intramural matters'" (quoting *Coeur d'Alene*, 751 F.2d at 1116)). Moreover, the Band's contention inverts

the presumption of the applicability of federal statutes, which, as explained above, is grounded on the *Montana* presumption that tribes lack the inherent power to govern the activities of non-members. *See* 450 U.S. at 565.

The Band emphasizes that the tribal commercial activity at issue is not a farm, sawmill, or lumber mill, but a sophisticated casino gaming operation, operated in accordance with federal approval under the IGRA, funding approximately fifty percent of the Band's tribal government. We do not find that the IGRA renders commercial gaming an untouchable aspect of tribal self-governance, leaving the Band to operate gaming enterprises free from all other federal regulations. We recognize that Congress's explicit goal in enacting the IGRA is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal government." 25 U.S.C. § 2702(1) (policy statement). Indeed, under the IGRA, the net revenue from the Band's gaming operations is not to be used for other purposes. *See* 25 U.S.C. § 2710(b)(2). The IGRA protects gaming as a source of tribal revenue from organized crime and other corrupting influences. 25 U.S.C. § 2702(2)–(3) (policy statement). It does not, however, immunize the operation of Indian commercial gaming enterprises from the application of other generally applicable congressional statutes. *See Chickasaw Nation*, 534 U.S. at 86–89 (holding that the IGRA section providing that Indian gaming operations, like state gaming operations, must report certain player winnings to the federal government, and must likewise withhold federal taxes if players' winnings exceed certain level, did not give rise to negative inference that Congress intended to exempt Indian tribes from federal wagering excise taxes imposed by chapter 35 of the Internal Revenue Code); *see also Chickasaw Nation v. United States*, 208 F.3d 871, 881–84 (10th Cir. 2000), *aff'd*, 534 U.S. 84 (2001). In *Chickasaw Nation*, the Tenth Circuit directly addressed the import of the IGRA's policy statement. The court held that "the statute's statement of purpose does not, in and of itself, demonstrate any type of Congressional intent to place tribal gaming revenues beyond the reach of federal wagering excise or federal occupational taxes." *Id.* at 881. The same may be said of the NLRA, the application of which affects the net tribal revenue from the IGRA gaming operations in a more tangential and less certain way than the application of title 35 of the Internal Revenue Code. *Cf. San Manuel*, 475 F.3d at 1315 (finding that "[t]he total impact . . . at

issue here amounts to some unpredictable, but probably modest, effect on tribal revenue"). The IGRA provides a statutory basis to regulate tribal gaming activities, but from that fact it does not follow that Congress intended that no other federal regulations apply to a tribe's operation of a commercial gaming facility. *See San Manuel*, 475 F.3d at 1318.

We do not read *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), or *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983), to require a contrary result. Those cases, decided before the enactment of the IGRA, held that state regulatory jurisdiction did not reach Indian tribes because federal interests in tribal self-government and economic development predominate. *See Cabazon*, 480 U.S. at 216–22; *Mescalero*, 462 U.S. at 341–344. But the relationship between the federal government and the Indian tribes is vastly different than the relationship between the states and the Indian tribes. *Cabazon* and *Mescalero* cannot be stretched to suggest that comprehensive, *federal* regulatory schemes do not presumptively apply to tribal commercial enterprises, even where those enterprises are both regulated by and fund tribal governments.

The Band also argues that because the Board's exercise of jurisdiction undermines a general enactment of its tribal government, application of the NLRA would undermine its right of self-governance in purely intramural matters. But again, it cannot be the rule that, unlike states, a tribal government may avoid application of a generally applicable federal statute by enacting a regulation governing the activities of non-members and members alike. *See Pueblo of San Juan*, 276 F.3d at 1205 (Murphy, J., dissenting). The Band rejoins that the enactment and implementation of Articles XVI and XVII to govern labor relations of its own citizens is "inextricably intertwined" with its ability to apply identical legal standards to non-member employees. We reject the notion that the Band's authority to govern the activities of its own citizens is coextensive with the Band's authority to govern the activities of non-members. *See Montana*, 450 U.S. at 564–66; *Fletcher*, 10 U.S. at 87. We also doubt that the Band's Tribal Council lacks the ability to enact legislation exclusively governing the labor and organizing rights of Band members if its saw fit to do so. At bottom, the Band's "inextricably intertwined" argument is a rule-swallower. *Cf. Plains Commerce*, 554 U.S. at 330 (stating that the exceptions permitting an Indian tribe's regulation of non-member activities "cannot be construed in a matter

that would swallow the rule" expressed in *Montana* that tribal power over non-members is implicitly divested). Tribal regulation that targets the activities of both members and non-members does not *ipso facto* trump a generally applicable federal regulation. To establish a contrary rule would swallow the presumption that federal statutes of general applicability also apply to Indian tribes.

B.

The Band submits that there is proof that Congress intended the NLRA not to apply to Indians on their reservations and, hence, this case falls within the third *Coeur d'Alene* exception. *See Coeur d'Alene*, 751 F.2d at 1116. The "proof" the Band offers is Congress's decision not to include Indian nations within Section 301 of the NLRA, which provides a private right of action for "violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). The Band argues that since Congress did not waive tribal sovereign immunity when it created a private right of action to enforce collective-bargaining agreements, it must be that no provision in the NLRA applies to Indian tribes.

We cannot agree. We recognize that Indian tribes are immune from suit in both state and federal court unless "Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). Indian tribes, however, have no sovereign immunity against the United States. *Fla. Paraplegic Ass'n*, 166 F.3d at 1135 (citing *Mashantucket Sand & Gravel*, 95 F.3d at 182)); *see also United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380, 382 (8th Cir. 1987). Furthermore, Congress may choose to impose an obligation on Indian tribes without subjecting them to the enforcement of that obligation through a private right of action. *See Santa Clara Pueblo*, 436 U.S. at 65 (finding that although the Indian Civil Rights Act of 1968 did not waive tribal immunity, the act nevertheless imposes obligations on tribes which may be enforced through vehicles other than private right of action); *Fla. Paraplegic Ass'n*, 166 F.3d at 1134. That choice, however, simply does not evince Congress's intent that a statute not impose obligations on Indian tribes or that those obligations not be enforced by other means, for example, by agency action. *See Santa Clara Pueblo*, 436 U.S. at 65; *Fla. Paraplegic Ass'n*, 166 F.3d at 1134. The fact that Congress did not waive tribal

sovereign immunity from private suits to enforce collective-bargaining agreements under Section 301 in no way suggests that the Band is immune from suits by the Board to enforce other requirements imposed by NLRA.

In sum, we find that this case does not fall within the exceptions to the presumptive applicability of a general statute outlined in *Coeur d'Alene*. The NLRA does not undermine the Band's right of self-governance in purely intramural matters, and we find no indication that Congress intended the NLRA not to apply to a tribal government's operation of tribal gaming, including the tribe's regulation of the labor-organizing activities of non-member employees.

C.

The NLRA excepts "any State or political subdivision thereof" from the definition of "employer." *See* 29 U.S.C. § 152(2). The Band's final contention is that, in light of comity principles, we must interpret the NLRA to treat Indian tribes exercising sovereign functions within their reservation and trust lands the same way that the NLRA treats states. But the Band is not a state, and tribal sovereignty and state sovereignty are built on different foundations and are accorded different protections in our constitutional order. *See Plains Commerce*, 554 U.S. at 337; *Lara*, 541 U.S. at 212 (Kennedy, J., concurring); *Merrion*, 455 U.S. at 172–73 (Stevens, J., dissenting). Thus we do not presume that when Congress excepted the states from the coverage of the term "employer" under § 152(2), it necessarily also intended to except the Indian tribes. Furthermore, if Congress intended to include Indian tribes within its explicit list of exceptions to "employer," it would have done so. *See San Manuel*, 475 F.3d at 1317 (holding that "the Board could reasonably conclude that Congress's decision not to include an express exception for Indian tribes in the NLRA was because no such exception was intended or exists"). We do not interpret the NLRA's exception for the states and their political subdivisions to encompass the Band. Accordingly, we hold that the Act applies.

V.

The application for enforcement is granted.

———————————

**DISSENT**

———————————

McKEAGUE, Circuit Judge, dissenting.   The sheer length of the majority's opinion, to resolve the single jurisdictional issue before us, betrays its error.   Under governing law, the question presented is really quite simple.   Not content with the simple answer, the majority strives mightily to justify a different approach.   In the process, we contribute to a judicial re-making of the law that is authorized neither by Congress nor the Supreme Court.   Because the majority's decision impinges on tribal sovereignty, encroaches on Congress's plenary and exclusive authority over Indian affairs, conflicts with Supreme Court precedent, and unwisely creates a circuit split, I respectfully dissent.

**I**

All agree that Indian tribes are sovereign political entities that retain their sovereignty. All agree that Congress has plenary authority over Indian affairs and that tribal sovereignty is subject to complete defeasance by Congress.   All agree that federal law will not be deemed to limit tribal sovereignty absent evidence of congressional intent to do so.   All agree that the National Labor Relations Act, the exclusive basis for the National Labor Relations Board's exercise of jurisdiction in this case, is silent as to Indian tribes.   The Board's order, prohibiting the Little River Band of Ottawa Indians from enforcing its Fair Employment Practices Code, clearly impinges on an exercise of the Band's tribal sovereignty.   No one denies that the record is devoid of evidence of congressional intent, express or implied, to authorize such an interference with tribal sovereignty.   The proper inference to be drawn from Congress's silence, I submit, is that tribal sovereignty is preserved and the Board's incursion is unauthorized by law.

The majority, however, approves the Board's adoption of a different way of construing congressional silence, a way that has never been approved by the Supreme Court or applied in any circuit to justify federal intrusion upon tribal sovereignty under the NLRA.   In my opinion, under current governing law, the Board's exercise of jurisdiction is simply beyond its authority, an arrogation of power that Congress has not granted.   Hence, the Board's action not only

impinges impermissibly on tribal sovereignty, but also encroaches on Congress's exclusive and plenary authority over Indian affairs. By failing to so hold, we neglect our duty to preserve the constitutionally mandated balance of power among the coordinate branches of government.

## II

### A. The NLRB's Evolving Approach

The majority recognizes that our review of the Board's assessment of its jurisdiction is de novo. *Chevron* deference plays no role. The majority also acknowledges that the NLRA is silent as to Indian tribes and that the Board's exercise of jurisdiction in this case is premised fundamentally, not on any other act of Congress or governing judicial decision, but on principles effectively announced in its own prior decision in *San Manuel Indian Bingo and Casino*, 341 NLRB 1055 (2004), *aff'd on alternate grounds*, 475 F.3d 1306 (D.C. Cir. 2007). Until just prior to its *San Manuel* decision, the NLRB had consistently held that Indian tribes and their enterprises were exempt from regulation under the NLRA. *Id.* at 1055. The NLRB's earlier approach was based on respect for the traditional view that Indian tribes are generally free from federal intervention "unless Congress has specifically provided to the contrary." *Id.* at 1059. Indeed, the NLRB's earlier precedents were entirely consistent with the established jurisprudence. *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) ("Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories."); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978) ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."); *United States v. Wheeler*, 435 U.S. 313, 323 (1978) (recognizing that sovereignty retained by tribes is subject to complete defeasance by Congress, but that "until Congress acts, the tribes retain their existing sovereign powers"). Indeed, the Supreme Court recently reaffirmed the "enduring principle of Indian law" that tribal sovereignty is retained unless and until Congress clearly indicates intent to limit it. *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024, 2030–32 (2014).

So what changed to justify the NLRB's new approach?  Congress has not amended the NLRA or in any other way signaled its intent to subject Indian tribes to NLRB regulation.  Nor has the Supreme Court recognized any such implicit intent.  The NLRB "adopted a new approach" and "established a new standard" based on its recognition that some courts had begun to apply *other* generally applicable federal laws to Indian tribes notwithstanding Congress's silence.  *San Manuel*, 341 NLRB at 1055, 1057, 1059.  These courts, the NLRB observed, found support for this new approach in a single statement in a 1960 Supreme Court opinion, *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960):  "[I]t is now well-settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests."  The statement buttressed the Court's holding, but was not essential to it.  While the *Tuscarora* statement has blossomed into a "doctrine" in some courts in relation to some federal laws, closer inspection of the *Tuscarora* opinion reveals that the statement is in the nature of dictum and entitled to little precedential weight.  In reality, the *Tuscarora* "doctrine," here deemed to grant the NLRB "discretionary jurisdiction," is used to fashion a house of cards built on a fanciful foundation with a cornerstone no more fixed and sure than a wild card.

In *Tuscarora*, the Federal Power Act, "a complete and comprehensive plan" which by its terms addressed "tribal lands embraced within Indian reservations," was held to sufficiently *express congressional intent* to authorize an exercise of eminent domain over land owned by individual Indians or even by a tribe if the land was not "within a reservation." *Id.* at 118.  The *Tuscarora* Court did not have to define the scope of Federal Power Commission jurisdiction in the face of congressional silence; it declared and enforced Congress's *manifest* intent.  Moreover, inasmuch as the Indian-owned land at issue in *Tuscarora* was not within the reservation, no interest of tribal sovereignty was implicated, but only tribal proprietary interests.  And finally, the notion that the *Tuscarora* statement, independent of the Court's actual holding, has any controlling or persuasive weight is negated by subsequent Supreme Court rulings applying traditional Indian law principles and upholding tribal sovereignty in the face of generally applicable federal laws—without even mentioning *Tuscarora*.  *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987) (tribal sovereignty upheld in the face of assertion of the

generally applicable federal diversity statute because no indication of congressional intent to impair tribal sovereignty); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 149 (1982) (congressional silence deemed insufficient to justify preemption of tribal sovereign power to tax). Indeed, in *Bay Mills*, the Court's most recent treatment of tribal sovereignty, *Tuscarora* played absolutely no role as the Court adhered to the same traditional Indian law principles in holding Michigan's attempt to restrain casino gaming barred by tribal sovereign immunity, a core aspect of tribal sovereignty. *Bay Mills*, 134 S. Ct. at 2030–39.

The *Tuscarora* statement, properly understood, thus offers little authoritative guidance on the present jurisdictional question. Yet, the NLRB noted in *San Manuel* that the *Tuscarora* "seed" had germinated in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (9th Cir. 1985), in relation to the Occupational Safety and Health Act. In *Coeur d'Alene,* the Ninth Circuit recognized that the *Tuscarora* statement was dictum, but nonetheless applied it to (1) reject the proposition that Indian tribes are subject only to those laws expressly made applicable to them; and (2) hold that tribes and their members are subject to generally applicable laws unless expressly excluded. *Id.* at 1115–16. In one fell swoop, the *Coeur d'Alene* court thus used the twenty-five year old *Tuscarora* statement to *reverse* the established presumption arising from congressional silence. According to the *Coeur d'Alene* innovation, congressional silence in a generally applicable law would now give rise to a reversed presumption: the law applies to Indian tribes *unless* one of three exceptions is shown to apply.

Seventeen years later, the NLRB first invoked this *Tuscarora-Coeur d'Alene* approach to justify its assertion of jurisdiction to bar enforcement of a tribal right-to-work law in *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002) (en banc). In *Pueblo of San Juan*, the NLRB advanced all the same arguments that are presented here. In a comprehensive opinion, the Tenth Circuit, sitting en banc, upheld traditional Indian law principles; required the NLRB to present evidence of Congress's intent to divest tribal power through the NLRA; and, finding none, held the tribal law was not preempted by the NLRA. *Id.* at 1190–98.

In response to the NLRB's reliance on *Tuscarora*, the Tenth Circuit refused to read the *Tuscarora* statement in isolation. It refused to give the statement independent significance apart

from the controversy actually decided in *Tuscarora*. The court recognized that the application of the Federal Power Act in *Tuscarora* only impacted the tribe's proprietary interests as landowner; it did not impair tribal sovereign authority to govern, as was clearly implicated by the Pueblo of San Juan's labor regulation. Citing the Supreme Court's ruling in *Merrion*, 455 U.S. at 137, the Tenth Circuit recognized that enactment of Pueblo's right-to-work ordinance was in furtherance of its strong interest in regulating economic activity involving its own members within its own territory, "a fundamental attribute of sovereignty" and "a necessary instrument of self-government and territorial management." *Pueblo of San Juan*, 276 F.3d at 1200. The Tenth Circuit reiterated and enforced the well-established traditional Indian law principles, holding that *Tuscarora* may not be applied by the NLRB to divest a tribe of its sovereign authority without clear indications of congressional intent to do so. *Id.* at 1199–1200.

In 2002, the Tenth Circuit thus squarely rejected the NLRB's innovative attempt to overrule its own prior precedents based on dictum appearing in a 1960 Supreme Court opinion. Undeterred, the NLRB tried again in *San Manuel*, 341 NLRB 1055. Employing the *Tuscarora-Coeur d'Alene* standard, the NLRB again posited that, because the NLRA is silent and *does not preclude* exercise of jurisdiction, it follows that the NLRB *has* discretionary authority to balance interests of Indian sovereignty with interests of federal labor policy on a case-by-case basis. *Id.* at 1062–63. Again, the NLRB, in a tortured twist of logic, reasoned that because Congress, the branch of federal government with exclusive and plenary authority to divest Indian tribes of their retained sovereign powers, said nothing about Indian tribes in the NLRA, Congress must have meant to grant the NLRB discretionary authority to intrude upon Indian sovereignty as it sees fit. Extraordinary. In overruling its own prior precedents, the NLRB barely mentioned the Tenth Circuit's contrary analysis in *Pueblo of San Juan*, the only court to have addressed (and definitively rejected) the NLRB's new approach. The NLRB summarily dismissed *Pueblo of San Juan* in a footnote, characterizing it as "the opinion of a single court of appeals." *Id*. at 1060 n.16.[1]

---

[1]Secondarily, the NLRB suggested *Pueblo of San Juan* is factually distinguishable in that it implicated an exercise of tribal sovereign power; whereas in *San Manuel*, the NLRB asserted jurisdiction only to regulate commercial activities of the tribe in its proprietary capacity. 341 NLRB at 1060 n. 16. As pointed out by the dissent

The NLRB's *San Manuel* decision was affirmed on appeal; but its rationale was not. *San Manuel Indian Bingo and Casino v. NLRB*, 475 F.3d 1306 (D.C. Cir. 2007). The D.C. Circuit recognized the tension between the *Tuscarora* statement, which it characterized as "possibly dictum," and traditional Indian law principles prohibiting interference with tribal sovereignty except upon clear expression of congressional intent. *Id.* at 1311. The court expressly refrained from endorsing the NLRB's *Tuscarora-Coeur d'Alene* approach. Yet, despite congressional silence, the D.C. Circuit allowed the NLRB's exercise of jurisdiction to stand, reasoning that the tribal interests impacted were "primarily commercial" and the impact on tribal sovereignty would be "unpredictable, but probably modest." *Id*. at 1315.[2]

The D.C. Circuit thus steered a middle course, departing from established principles of Indian law, but refraining from adopting the *Tuscarora-Coeur d'Alene* approach. In doing so, the D.C. Circuit did not try to reconcile its ruling with, or distinguish it from, the Tenth Circuit's *Pueblo of San Juan* ruling. In fact, it conspicuously avoided any reference to the Tenth Circuit's analysis. The NLRB thus obtained a favorable result, but the D.C. Circuit's *San Manuel* decision falls far short of vindication for the NLRB. Far from establishing a new way of understanding the reach of the NLRA in relation to Indian tribes, the D.C. Circuit's ruling is distinctly pragmatic and fact-specific.[3]

---

in *San Manuel*, this distinction does not withstand scrutiny. In both cases, the NLRB asserted jurisdiction under the NLRA to preempt analogous tribal labor relations ordinances. *Id.* at 1067.

[2]The court reached this conclusion by focusing on the specific dispute at issue, competition between two unions to organize employees at a casino owned and operated by the tribe. The NLRB had ordered the tribe to grant equal access to both unions. Even though the court noted that employment relations at the casino were subject to a tribal labor ordinance, which represented an act of governance, the court held the ordinance was only "ancillary" and "secondary" to the commercial undertaking at issue. The D.C. Circuit thus focused on the tribe's proprietary interest as owner of a commercial enterprise, rather than its status as sovereign of the territory where the casino was located.

[3]The facts of this case are materially distinguishable from those presented in *San Manuel*. The nature of the NLRB's instant intrusion—not simply resolving a particular dispute between unions at a casino, but asserting the NLRA's preemptive effect to bar enforcement of numerous provisions of the Band's comprehensive FEP Code indefinitely—threatens a much more substantial impairment of the Band's sovereign authority. *See also Pueblo of San Juan*, 276 F.3d at 1200 (recognizing that NLRA preemption of a tribe's legislative enactment regulating labor and employment relations within the reservation is a unique threat to "a fundamental attribute of sovereignty and a necessary instrument of self-government and territorial management"). Moreover, the D.C. Circuit's notion that tribal interests of a commercial nature warrant only diminished tribal-sovereignty respect has been squarely rejected by the Supreme Court in *Bay Mills*, 134 S. Ct. at 2039 (reasoning that any such limitation of tribal sovereignty in relation to commercial activity is not for the courts to decide, but is a matter for Congress's policy judgment).

**B. The Board's Present Assertion of Jurisdiction**

These are the relevant judicial precursors to the Board's present assertion of jurisdiction under the NLRA. Relying on the "*Tuscarora* doctrine" and the new "discretionary jurisdictional standard" it adopted in its *San Manuel* decision, the Board exercised its discretion to hold the Little River Band's Fair Employment Practices Code preempted by the NLRA. *Little River Band of Ottawa Indians Tribal Gov't*, 359 NLRB No. 84 at *4 (2013). The Board concluded, in the discharge of its newly created interest-balancing duties, that the FEP Code need not be respected as an exercise of tribal sovereign authority because the Code governs, among other things, employment relations at a commercial enterprise operated by the Band, the Little River Casino Resort. Although the Resort is located and operated entirely within the reservation, non-Indians are employed there and non-Indians are customers there, and the Resort's operation affects interstate commerce. *Id.* at *4–6. These factors were deemed sufficient to justify preemption by the NLRA and assertion of jurisdiction by the NLRB.

The Board rejected the Band's reliance on *Pueblo of San Juan* in challenging its assertion of jurisdiction. The Board characterized the Tenth Circuit's decision as narrow and inapposite because it did not involve a federal law of general applicability—even though it involved application of the NLRB's assertion of the very same NLRA to preempt a closely analogous tribal employment relations law. *Id.* at *5. In further explanation, the Board also noted its prerogative, pursuant to its "nonacquiescence policy," to respectfully disagree with the Tenth Circuit. *Id.* at *5 n.8.

In my opinion, the analysis employed by the Tenth Circuit in *Pueblo of San Juan* is true to the governing law and should be adopted in the Sixth Circuit as well. It is not necessary to recapitulate that reasoning here. Neither the Board nor the majority has identified error in the Tenth Circuit's analysis. Tellingly, the Board has not asked us to apply the D.C. Circuit's *San Manuel* hybrid approach in this case. Rather, it continues to pursue judicial approval of its new *Tuscarora-Coeur d'Alene* approach. The Tenth Circuit considered it and definitively rejected it. The D.C. Circuit considered it and demurred. Today, in the Sixth Circuit, the Board finds a sympathetic ear . . . notwithstanding Congress's silence, notwithstanding the suspect origins of

the *Tuscarora-Coeur d'Alene* "doctrine," and notwithstanding the lack of any persuasive reason to depart from the traditional Indian law principles that the Supreme Court has consistently applied. This sympathy seems particularly ill-timed in view of the Supreme Court's recent re-affirmation of the traditional principles in *Bay Mills*.

### C. Particular Objections

But before considering the significance of *Bay Mills*, several elements of the majority's approval of the Board's innovation deserve particular mention. First, my colleagues purport to find legitimacy for the Board's new approach in two Supreme Court opinions that are said to "anticipate" this evolution in traditional Indian law principles. The first of these is the *Tuscarora* opinion itself. *Tuscarora*, of course, speaks for itself. The grounds for my conclusion that some courts, and now the Board, have read much more into the *Tuscarora* statement than was ever intended are adequately stated above. Not least of these is the fact that the *Tuscarora* statement (much less the *Tuscarora* "doctrine") has been ignored by the Supreme Court ever since. Moreover, even those courts that have viewed the statement as significant have recognized it to be in the nature of dictum. Lastly, the holding in *Tuscarora*, on the reach of the Federal Power Act: (a) did not result in any impairment of tribal sovereignty; and (b) hinged not on the generally-applicable nature of the Act, but on the Court's discernment of Congress's *manifest* intent. The *holding* of *Tuscarora*, then, is entirely consonant with traditional Indian law principles. The *Tuscarora* holding gave effect to the clear indications of congressional intent, just as we should here . . . to the extent there are any.

The majority also cites *Merrion* as signaling the Supreme Court's willingness to find implicit divestiture of tribal sovereignty in a federal law of general applicability. Majority Op. at 12 n.1.) Yet, the *Merrion* Court *held* that just such a generally applicable law, the Natural Gas Policy Act, did *not* effect a divestiture precisely because the text and legislative history did not evidence such a congressional intent. *Merrion*, 455 U.S. at 152. *Merrion*, too, thus confirms traditional Indian law principles: absent some clear indication from Congress, a federal law will not be deemed to implicitly impair tribal sovereignty simply because it is generally applicable.

Nonetheless, my colleagues note that the FEP Code affects non-Indians who obtain employment within the Band's trust lands. Without denying that the FEP Code is a generally applicable and comprehensive regulatory scheme in exercise of the Band's tribal sovereignty, the majority prefers to characterize the Code narrowly (and disparagingly) as a mere "regulation of activities of non-members." Hence, the majority opinion cites several Supreme Court decisions that recognized limitations on tribal sovereign authority to regulate non-Indians even in the absence of congressional action or indications of congressional intent to divest tribal power. Majority Op. at 8–11. The cited decisions are inapposite.

In *Montana v. United States*, 450 U.S. 544, 564–66 (1981), for instance, the Court held not that tribal sovereign power had been implicitly divested by Congress, but that the tribe did not have authority in the first place via "retained inherent sovereignty" to regulate hunting and fishing by nonmembers of the tribe on lands no longer owned by the tribe—unless the nonmembers entered consensual relationships with the tribe through commercial dealing, contracts, leases, or other arrangements; or unless the conduct of nonmembers on fee lands within the reservation threatened or had some direct effect on the political integrity, economic security, or health and welfare of the tribe. To similar effect are the decisions in *Plains Commerce Bank v. Long Family Land and Cattle Co., Inc.*, 554 U.S. 316, 341 (2008), and *Nevada v. Hicks*, 533 U.S. 353, 358–60 (2001). That is, all three cases, *Montana*, *Plains Commerce* and *Hicks*, deal with the bounds of retained inherent sovereignty, not the implicit divestiture thereof.

Here, in contrast to those cases, there is no real dispute that the Little River Band's enactment of the FEP Code, regulating employment relations between the tribe and tribal members and nonmembers alike, on tribal lands within the Tribal Government's jurisdiction, is a bona fide exercise of inherent sovereign authority. *See Merrion*, 455 U.S. at 137 (recognizing that a tribe's authority to regulate economic activity within its territory is among its retained sovereign powers). To the extent that nonmembers are subject to regulation under the FEP Code, the regulation flows directly from the Band's inherent sovereign interests in tribal self-government and management of internal relations. *See Plains Commerce*, 544 U.S. at 335; *Montana*, 450 U.S. at 564. In the language of *Hicks*, the FEP Code is a "[t]ribal assertion of

regulatory authority over nonmembers . . . connected to that right of the Indians to make their own laws and be governed by them." *Hicks*, 533 U.S. at 561. Yes, the Band's interest in regulating nonmembers may be weaker, but the nonmembers that come within the FEP Code's regulation have entered into consensual contractual (employment) relationships with the Band and are therefore properly subject to the Code's requirements. *See Montana*, 450 U.S. at 565.

While these decisions address questions regarding the scope of retained inherent tribal sovereignty, the instant appeal, as the majority recognizes, presents a different question. Majority Op. at 7–8. The Band's authority to enact the FEP Code is unquestioned. We must instead decide whether, under traditional Indian law principles, the *Board* has authority, per its "new approach," to interfere with the Band's legitimate exercise of tribal sovereignty, and specifically, whether there are clear indications that Congress has authorized such interference, explicitly or implicitly. Because there are no such clear indications, as the majority must concede, we should stay the Board's overreaching hand—unless and until Congress acts or the Supreme Court alters the governing law. *See Bay Mills*, 134 S. Ct. at 2037 (recognizing "it is fundamentally Congress's job, not ours," to determine the nature and extent of tribal sovereignty).

### D. Teaching of *Bay Mills*

Indeed, *Bay Mills* clearly illustrates the Court's steadfast deference to Congress's plenary and exclusive role in defining tribal sovereignty: "Although Congress has plenary authority over tribes, courts will not lightly assume that Congress intends to undermine Indian self-government." *Bay Mills*, 134 S. Ct. at 2031–32. The Court enforced the "enduring principle of Indian law" requiring that Congress "unequivocally express" its intent to limit tribal sovereignty. *Id.* Thus, where Congress had expressly abrogated tribal immunity from suit for illegal gaming *on Indian lands*, the Court refused to expand the abrogation to allow suit for illegal gaming *outside Indian country*, even though the resulting anomaly was arguably nonsensical. *Id.* at 2033–34. The Court reasoned that "Congress should make the call whether to curtail a tribe's immunity for off-reservation commercial conduct—and the Court should accept Congress's judgment." *Id.* at 2038.

Moreover, the Court expressly declined to draw the distinction, here urged by the Board as well, between actions of tribal self-governance and commercial activities of the tribe. The court gave one "simple reason: because it is fundamentally Congress's job, not ours." *Id.* at 2037. Congress, the Court observed, "has the greater capacity to weigh and accommodate the competing policy concerns." *Id.* at 2037–38 (internal quotation marks omitted).

*Bay Mills* is not controlling, but it highlights the incorrectness of the majority's analysis. A couple of particular examples further illustrate the point. One sentence that typifies the majority's opinion reads as follows: "The tribes' retained sovereignty reaches only that power needed to control internal relations, preserve their own unique customs and social order, and prescribe and enforce rules of conduct for their own members." Majority Op. at 16 (internal alterations omitted). The statement simply cannot be reconciled with *Bay Mills*, for we know that a tribe's sovereignty encompasses *all* historic "core aspects" of its sovereignty—more than just controlling internal relations (and including immunity from suit). *Bay Mills*, 134 S. Ct. at 2030; *see also Kiowa Tribe of Oklahoma v. Mfg. Technologies, Inc.*, 523 U.S. 751, 758 (1998) ("[T]ribal [sovereignty] extends beyond what is needed to safeguard tribal self-governance."). Or consider another sentence from the majority opinion: "[W]hen a tribal government goes beyond matters of internal self-governance and enters into an off-reservation business transaction with non-Indians, its claim of sovereignty is at its weakest." Majority Op. at 8–9 (internal citations omitted). But such a transaction in *Bay Mills* did not weaken the tribe's sovereignty whatsoever; the Supreme Court required a clear congressional statement to abrogate the tribe's immunity.

The majority opinion reads as if *Bay Mills* doesn't exist. It relies on *Montana* as "chart[ing] the *contemporary* law of implicit divestiture of inherent tribal sovereignty." *Id.* at 9 (emphasis added). Yet, as explained above, *Montana* is not a divestiture case at all; *Bay Mills* is. And in the debate between the justices in *Bay Mills*, thirty-three years after *Montana*, we find a truly contemporary clarification of Indian sovereignty. The dissent in *Bay Mills* would have applied a "modest scope of tribal sovereignty . . . limited only to 'what is necessary to protect tribal self-government or to control internal relations.'" *Bay Mills*, 134 S. Ct. at 2048 (Thomas, J., dissenting) (quoting *Montana*, 450 U.S. at 564). That sounds like the majority opinion. But

the Court *rejected* that modest scope of tribal sovereignty in favor of a more robust one. *Bay Mills*, 134 S. Ct. at 2031–32. Even though neither the Court nor any party "suggested that immunity from the isolated suits that may arise out of extraterritorial commercial dealings is somehow fundamental to protecting tribal government or regulating a tribe's internal affairs," *id.* at 2048 (Thomas, J., dissenting), the Court upheld the tribe's sovereignty.

In sum, the majority's sympathy for the Board's assertion of jurisdiction in this case not only finds precious little support in, but is affirmatively undercut by, the Supreme Court's most recent pronouncements on Indian sovereignty.

**III**

To be clear, my difference with the majority opinion has nothing to do with the wisdom of applying the NLRA's provisions to employment relations on Indian lands. Such a matter of policy is within Congress's exclusive and plenary authority. There simply is no indication that the NLRB's new approach is harmonious with congressional intent. In fact, the best indications are actually to the contrary.

Congress has been committed to a policy of promoting tribal self-government by encouraging tribal self-sufficiency and economic development. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334–35 (1983). The Band's FEP Code, regulating labor and employment relations within its territory, is an exercise of sovereign authority entirely consonant with congressional policy. A majority of the labor and employment relations governed by the FEP Code apply to operations at the Little River Casino Resort. The Resort was established under the Indian Gaming Regulatory Act, effectuating Congress's express purpose of "promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). This purpose is consonant with the Supreme Court's recognition that Indian gaming is an instrument of tribal sovereignty not unlike the taxing power, because it provides revenues for the operation of tribal government and provision of essential tribal services. *Cabazon Band*, 480 U.S. at 218–20. *See also Bay Mills*, 134 S. Ct. at 2043 (Sotomayor, J., concurring) (recognizing that "tribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate

from the Tribes' core governmental functions" because "tribal business operations are critical to the goals of tribal self-sufficiency").

There are thus manifest reasons to conclude that Congress's silence regarding application of the NLRA to Indian tribes should *not* be read as implicitly authorizing divestment of tribal sovereignty. At the same time, there are sound reasons to abide by traditional Indian law principles and view Congress's silence as reflective of intent to uphold tribal sovereignty. As the Supreme Court recently observed, "Congress of course may always change its mind—and we would readily defer to that new decision." *Bay Mills*, 134 S. Ct. at 2039. But where Congress has had the opportunity to reflect on an issue of tribal sovereignty and declined to change settled law, proper respect for its plenary authority cautions against viewing Congress's silence as anything other than continuing approval of settled law. *Id.*

Disregarding these reasons, and armed with no legal support other than the "new approach" it adopted in *San Manuel* in 2004, the Board insists that it now has "discretionary jurisdiction" under the NLRA. Under governing law, the Board's assertion of jurisdiction, wise or not, is plainly beyond its authority. The majority having identified no persuasive reason for complicity in the Board's usurpation of Congress's authority, I must dissent.

## IV

How does one statement of dictum, in a 1960 Supreme Court opinion, grow into a "doctrine," contrary to traditional principles of Indian law, yet justifying federal intrusion upon tribal sovereignty in 2015? It starts with litigants urging lower courts to adopt the dictum as a guiding rationale for extending the reach of federal law. Once one court agrees and, in the name of reasonableness, invents its own exceptions, other courts find it convenient to follow suit. Why not? It's a handy standard, and other courts are using it without disastrous consequences. And so it begins. Then the alert federal agency, sensing a shift in momentum and judicial receptivity to expansion of regulatory power, seizes the opportunity and completely inverts its preexisting approach. Now, despite congressional silence, the courts and executive are playing in unison. Never mind one setback in the Tenth Circuit; the dictum is now become a doctrine.

But it's also a house of cards. It should—and does—collapse when we notice what's inexplicably overlooked in the fifty-five years of adding card upon card to "a thing said in passing." Not only has the Supreme Court conspicuously refrained from approving it, but the "doctrine" is exactly 180-degrees backward. It presumes intent to limit tribal sovereignty when Congress is silent, even though congressional silence traditionally, and still, has been deemed insufficient to authorize limitation. *Bay Mills*, 134 S. Ct. at 2031–32. Our adding to, rather than blowing down, the house of cards at once usurps Congress's power, ignores Supreme Court precedent, creates a needless circuit split and, not least of all, impermissibly intrudes on tribal sovereignty. I respectfully dissent.